[S.F. No. 24893. Dec. 31, 1985.]

PAUL CIANCI, Petitioner, v.
THE SUPERIOR COURT OF CONTRA COSTA COUNTY, Respondent;
JOHN POPPINGO et al., Real Parties in Interest.

904

COUNSEL

Bolton & Cornblum, Marshall Cornblum and Jennifer Sobol for Petitioner.

No appearance for Respondent.

Berger & Taggart, Brian Connors, Gary D. Berger, Peter Desler, George J. Ziser, Carol A. Clifford, Moore, Clifford, Wolfe, Larson & Trutner, McShane & Felson and Kathleen T. Gunn for Real Parties in Interest.

Horvitz & Levy, Barry R. Levy, Michael R. Tyler, Hassard, Bonnington, Rogers & Huber and David E. Willett as Amici Curiae on behalf of Real Parties in Interest.

OPINION

**MOSK, J.**—We granted review to resolve two important questions: (1) whether state courts have jurisdiction concurrently with federal courts over alleged violations of the civil provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.); and (2) whether the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) applies to the medical profession. We answer each question in the affirmative.

I.

The action underlying this proceeding arises, in brief, out of a dispute among several medical doctors over the establishment, funding, and operation of a hyperbaric medicine department at Brookside Hospital in San Pablo.[1]

Robert W. Burns, M. D., Joseph D. Sabella, M. D., Burton F. Simmons, M. D., William C. Lyon, M. D., Morris B. Aron, M. D., Stuart I. Gourlay, M. D., Robert H. Herrick, M. D., Carol W. Kassell, and Joseph R. Marriotti, M. D. (hereafter the Burns group) filed a complaint against Paul Cianci, M. D., John Poppingo, M. D., and Ventox, Inc., seeking dissolu-

---

[1]Hyperbaric medicine involves treatment through the intermittent administration of pure oxygen, under pressure greater than that at sea level, in either a multiplace (i.e., multiple patient) chamber pressurized with compressed air or a monoplace (i.e., single patient) chamber pressurized with pure oxygen. It is the treatment of choice for decompression sickness (commonly called "the bends"), gas gangrene, carbon monoxide poisoning, and air embolism. It is also useful as adjunctive therapy in the treatment of problem wounds and life-threatening infections.

tion of a limited partnership, accounting, damages, and impressing of a constructive trust.

In response to the complaint, Cianci (petitioner here) answered and filed a cross-complaint against real parties in interest Poppingo, his attorneys Gary D. Berger, Berger & Taggart, Gary D. Berger Law Corporation, and William E. Taggart, Jr., Professional Corporation, and the Burns group. The cross-complaint alleges intentional and negligent interference, and conspiracy to interfere, with the right to practice hyperbaric medicine (the first through sixth causes of action); violation of, and conspiracy to violate, RICO (the seventh and eighth causes of action); and conspiracy to violate the Cartwright Act (the ninth cause of action). Real parties demurred to the seventh and eighth causes of action on the ground that federal courts have exclusive jurisdiction over RICO claims, and to the ninth cause of action on the ground that the Cartwright Act does not apply to the medical profession. The trial court sustained the demurrers on these grounds.

Petitioner now seeks to review these rulings by prerogative writ. We issued an alternative writ: the RICO issue is of first impression and of significant importance to the profession and the general public because of its impact on the interests of those whose businesses suffer injury through racketeering activity; the Cartwright Act issue is of similar importance because of its impact on the interests of the consumers of this state. (E.g., *Daly* v. *Superior Court* (1977) 19 Cal.3d 132, 140 [137 Cal.Rptr. 14, 560 P.2d 1193]; *Babb* v. *Superior Court* (1971) 3 Cal.3d 841, 851 [92 Cal.Rptr. 179, 479 P.2d 379].)[2]

## II.

■ Although the question is not without difficulty, we conclude for the reasons given below that state courts have concurrent jurisdiction over RICO claims. In sustaining the demurrers of real parties to petitioner's seventh and eighth causes of action on the ground state courts lack jurisdiction, the trial court erred.

The object of RICO, which is a part of the Organized Crime Control Act of 1970, is to prevent and punish "racketeering activity" broadly defined.

[2]We reaffirm our traditional reluctance to employ the prerogative writ to review rulings on pleadings. (E.g., *Environmental Planning & Information Council* v. *Superior Court* (1984) 36 Cal.3d 188, 190 [203 Cal.Rptr. 127, 680 P.2d 1086]; *Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 672 [170 Cal.Rptr. 484, 620 P.2d 1032]; *State of California* v. *Superior Court* (1974) 12 Cal.3d 237, 243, fn. 3 [115 Cal.Rptr. 497, 524 P.2d 1281]; *Babb* v. *Superior Court, supra*, 3 Cal.3d at p. 851.) We feel compelled to intervene in this case, however, because of the significant legal importance and the timeliness of the issues presented. (*Babb* v. *Superior Court, supra*, at p. 851.)

(See, e.g., *Sedima, S.P.R.L.* v. *Imrex Co., Inc.* (1985) — U.S. —, — [87 L.Ed.2d 346, 350, 105 S.Ct. 3275].) Although the sources from which it sprang took aim against the infiltration of legitimate businesses by organized crime, the statute as enacted is intended to ensure integrity in the marketplace and to that end strikes against all who would threaten it—at one end of the spectrum "mobsters and organized criminals" and their " 'illegitimate' enterprises," at the opposite pole otherwise law-abiding businessmen and their " 'respected and legitimate "enterprises." ' " (*Id.* at pp. —— [87 L.Ed.2d at pp. 352-361].) Indeed, "private civil actions under the statute are being brought almost solely against such ['legitimate'] defendants, rather than against the archetypal, intimidating mobster." (*Id.* at p. — [87 L.Ed.2d at p. 361].)

Under the statute, it is unlawful (1) to use income derived from a pattern of "racketeering activity" to acquire an interest in or to establish or operate an enterprise engaged in or affecting interstate commerce; (2) to acquire or maintain an interest in such an enterprise through a pattern of racketeering activity; (3) to conduct or participate in the conducting of such an enterprise through a pattern of racketeering activity; and (4) to conspire to do any of the foregoing proscribed acts. (18 U.S.C. § 1962.)

■ "Racketeering activity" is defined as any act in violation of several classes of state criminal laws or of several specified federal criminal provisions. (*Id.,* § 1961(1).) Consonant with the statute's underlying purpose, the effective scope of the term is broad: it includes not only the actions of mobsters but also the conduct of "legitimate" businessmen who engage in "garden variety" commercial fraud. (See *Sedima, supra,* — U.S. at pp. — -— [87 L.Ed.2d at pp. 352-361].)

A criminal enforcement scheme, which includes imprisonment, fines, and forfeiture, is established. (18 U.S.C. § 1963.) Also established is a civil enforcement scheme (*id.,* § 1964), which includes a private right of action: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of his suit, including a reasonable attorney's fee." (*Id.,* § 1964 (c).) Implicit in the private right of action is a grant of jurisdiction to federal courts.

■ Our analysis of the question of jurisdiction proceeds from a well-defined doctrinal base fashioned by the United States Supreme Court in decisions stretching from the landmark case of *Claflin* v. *Houseman* (1876) 93 U.S. 130 [23 L.Ed. 833], through *Dowd Box Co.* v. *Courtney* (1962) 368 U.S. 502 [7 L.Ed.2d 483, 82 S.Ct. 519], to *Gulf Offshore Co.* v. *Mobil Oil Corp.* (1981) 453 U.S. 473 [69 L.Ed.2d 784, 101 S.Ct. 2870].

■ "The general principle of state-court jurisdiction over cases arising under federal laws is straightforward: state courts may assume subject-matter jurisdiction over a federal cause of action absent provision by Congress to the contrary or disabling incompatibility between the federal claim and state-court adjudication." (*Gulf Offshore Co., supra,* 453 U.S. at pp. 477-478 [69 L.Ed.2d at p. 791]; accord, *Dowd Box Co., supra,* 368 U.S. at pp. 507-508 [7 L.Ed.2d at p. 487]; *Claflin, supra,* 93 U.S. at p. 136 [23 L.Ed. at p. 838].) "This rule is premised on the relation between the States and the National Government within our federal system. [Citation.] The two exercise concurrent sovereignty . . . . Federal law confers rights binding on state courts, the subject-matter jurisdiction of which is governed in the first instance by state laws." (*Gulf Offshore Co., supra,* at p. 478 [69 L.Ed.2d at p. 791]; see Redish & Muench, *Adjudication of Federal Causes of Action in State Court* (1976) 75 Mich.L.Rev. 311, 314 [hereafter Redish & Muench].) Practice has followed theory. "Concurrent jurisdiction has been a common phenomenon in our judicial history, and exclusive federal court jurisdiction over cases arising under federal law has been the exception rather than the rule." (*Dowd Box Co., supra,* at pp. 507-508 [7 L.Ed.2d at p. 487].)

Accordingly, "[i]n considering the propriety of state-court jurisdiction over any particular federal claim, [we] begin[] with the presumption that state courts enjoy concurrent jurisdiction. [Citations.] Congress, however, may confine jurisdiction to the federal courts either explicitly or implicitly. Thus, the presumption of concurrent jurisdiction can be rebutted by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests." (*Gulf Offshore Co., supra,* 453 U.S. at p. 478 [69 L.Ed.2d at p. 791].) Put otherwise, "the presumption is that jurisdiction is concurrent, and some strong showing of need for exclusive jurisdiction is required to overcome that presumption." (Redish & Muench, *supra,* 75 Mich.L.Rev. at p. 325, fn. 63.)

■ It is not argued, nor could it be, that the provision creating a private right of action (18 U.S.C. § 1964(c)) expressly confines jurisdiction over RICO claims to the federal courts. "On its face [section 1964(c)] simply gives the federal district courts jurisdiction over suits for violation of [RICO]. The statute does not state nor even suggest that such jurisdiction shall be exclusive. It provides that suits of the kind described 'may' be brought in the federal district courts, not that they must be." (*Dowd Box Co., supra,* 368 U.S. at p. 506 [7 L.Ed.2d at p. 486].) Indeed, "[i]t is black letter law . . . that the mere grant of jurisdiction to a federal court does not operate to oust a state court from concurrent jurisdiction over the cause of action." (*Gulf Offshore Co., supra,* 453 U.S. at p. 479 [69

L.Ed.2d at p. 792]; accord, *United States* v. *Bank of New York & Trust Co.* (1936) 296 U.S. 463, 479 [80 L.Ed. 331, 339, 56 S.Ct. 343].)

A preliminary observation is in order. In determining whether a congressional intention to limit jurisdiction to federal courts is implied by either the legislative history of RICO or its structure and substance, we are guided by a principle founded in the language of the statute itself (Pub. L. No. 91-452, § 904(a), 84 Stat. 947) and recognized by the courts (e.g., *Sedima, supra,* — U.S. at p. — [87 L.Ed.2d at p. 360]): in order to effectuate its remedial purposes, a liberal construction must be placed on RICO and especially on section 1964(c), in which "[t]he statute's 'remedial purposes' are nowhere more evident" (*ibid.*).

Real parties first urge that the legislative history of section 1964(c) establishes that Congress intended to limit jurisdiction over RICO claims to federal courts: section 1964(c) is modeled on section 4 of the Clayton Act (15 U.S.C. § 15), which grants jurisdiction over antitrust claims; section 4 has long been construed to grant exclusive jurisdiction to federal courts; the legislators who enacted section 1964(c) must be deemed to have known how the courts have construed section 4; and it is unreasonable to suppose that they modeled section 1964(c) on section 4 without intending to incorporate the latter's grant of exclusive jurisdiction into the former. Their reasoning, which is supported by *County of Cook* v. *Midcon Corp.* (N.D.Ill. 1983) 574 F.Supp. 902, and *Greenview Trading* v. *Hershman & Leicher, P.C.* (1985) 108 App.Div.2d 468 [489 N.Y.S.2d 502], carries a superficial appeal. When the legislative history is read with greater care, however, the argument falters and comes up short of establishing the "unmistakable implication from legislative history" (*Gulf Offshore Co., supra,* 453 U.S. at p. 478 [69 L.Ed.2d at p. 791]) necessary to rebut the presumption of concurrent jurisdiction.

"The legislative history of the Organized Crime Control Act of 1970 gives little hint of the intended scope of private action under civil RICO." (*Sedima, S.P.R.L.* v. *Imrex Co., Inc.* (2d Cir. 1984) 741 F.2d 482, 488, revd. on other grounds (1985) — U.S. — [87 L.Ed.2d 346, 105 S.Ct. 3275].) It gives even less hint of what Congress intended on the question of jurisdiction.

A brief review of the legislative history illustrates the point. "RICO formed Title IX of the Organized Crime Control Act of 1970 [citation]. The civil remedies in the bill passed by the Senate, S. 30, were limited to injunctive actions by the United States and became §§ 1964(a), (b), and (d). Previous versions of the legislation, however, had provided for a private treble damages action in exactly the terms ultimately adopted in § 1964(c).

[Citations.] [¶] During hearings on S. 30 before the House Judiciary Committee, Representative Steiger proposed the addition of a private treble damages action 'similar to the private damage remedy found in the anti-trust laws. . . .' [Citations.] The American Bar Association also proposed an amendment 'based upon the concept of Section 4 of the Clayton Act.' [Citations.] [¶] [T]he Committee approved the amendment. [Citation.] In summarizing the bill on the House floor, its sponsor described the treble damages provision as 'another example of the antitrust remedy being adapted for use against organized criminality.' [Citation.] . . . The House . . . passed the bill, with the treble damages provision in the form recommended by the Committee. [Citation.] [¶] The Senate did not seek a conference and adopted the bill as amended in the House." (*Sedima, supra,* — U.S. —, — [87 L.Ed.2d at pp. 352-353]; see generally Blakey, *The RICO Civil Fraud Action in Context: Reflections on Bennett v. Berg* (1982) 58 Notre Dame Law. 237, 249-280, annotating and analyzing legislative history.)

As the foregoing review of the legislative history shows, there is no evidence that Congress ever expressly considered the question of jurisdiction; indeed, the evidence establishes that its attention was focused solely on whether to provide a private right of action. As stated by Professor G. Robert Blakey, who was chief counsel to the Senate Subcommittee on Criminal Laws and Procedures, which proposed RICO: " 'There is nothing on the face of the statute or in the legislative history' that touches on the question of concurrent jurisdiction . . . . 'To my knowledge, no one even thought of the issue.' " (Flaherty, *Two States Lay Claim to RICO,* Nat.L.J. (May 7, 1984) p. 10, col. 2, quoting Professor Blakey [hereafter Flaherty].)

Nor can we conclude that Congress impliedly considered the question of jurisdiction in dealing with the grant of a private right of action.

To begin with, although section 1964(c) is generally modeled on section 4 of the Clayton Act, it does not follow that if the private antitrust right of action is associated with exclusive federal jurisdiction, Congress must have intended that the private RICO right of action be associated with exclusive federal jurisdiction as well. Exclusivity would obviously create an obstacle in the way of a private litigant, who would be compelled to bring his RICO claim in federal court even if he preferred a state forum. Such a result does not seem in accordance with Congress's intentions as we perceive them.

To begin with, as a general matter, Congress unmistakably intended that section 1964(c) be liberally construed to effectuate its remedial purposes; exclusive jurisdiction would tend to limit or frustrate those purposes. More specifically, "[i]t is . . . significant that a previous proposal to add RICO-like provisions to the Sherman Act had come to grief in part precisely be-

cause it 'could create inappropriate and unnecessary obstacles in the way of . . . a private litigant [who] would have to contend with a body of precedent—appropriate in a purely antitrust context—setting strict requirements on questions such as "standing to sue" and "proximate cause." ' " (*Sedima, supra,* — U.S. at p. — [87 L.Ed.2d at p. 360].) It is true that the "obstacles" that Congress thus intended to avoid were rooted in issues of substantive law and not jurisdiction. But this intention should strongly counsel us not to read the obstacle of exclusive jurisdiction into section 1964(c) on the sole basis of its similarity to section 4 of the Clayton Act.

Second, a private right of action does not necessarily entail exclusive federal jurisdiction; thus Congress cannot be deemed to have intended the latter simply by creating the former.

The absence of a necessary connection between a private right of action and exclusive federal jurisdiction is undisputed as a general matter. In the Petroleum Marketing Practices Act (15 U.S.C. § 2801 et seq.), for example, Congress created a private right of action without limiting jurisdiction to federal courts. (*Ted's Tire Service, Inc.* v. *Chevron U.S.A., Inc.* (D.Conn. 1979) 470 F.Supp. 163, 165.)

That a private right of action and exclusive federal jurisdiction are present in section 4 of the Clayton Act is attributable not to any necessary connection but to two distinct policies that inform the provision: "giving private parties treble-damage and injunctive remedies was not [intended] merely to provide private relief, but . . . to serve as well the high purpose of enforcing the antitrust laws." (*Zenith Corp.* v. *Hazeltine* (1969) 395 U.S. 100, 130-131 [23 L.Ed.2d 129, 152, 89 S.Ct. 1562]; accord, *United States* v. *Borden Co.* (1954) 347 U.S. 514, 518 [98 L.Ed. 903, 908, 74 S.Ct. 703].) Limiting jurisdiction to federal courts does not further the policy of encouraging enforcement of the antitrust laws; indeed, in some instances it may frustrate that policy by barring the litigant from a convenient state forum. Rather, exclusive federal jurisdiction serves the distinct goal of uniformity in the interpretation and application of laws relating to national and international commerce, "which by [their] own terms and subsequent judicial interpretation ha[ve] provided the courts with considerable authority to fashion the law of restraint of trade as they see fit." (Redish & Muench, *supra,* 75 Mich.L.Rev. at p. 332; see, e.g., *Standard Oil Co.* v. *United States* (1911) 221 U.S. 1, 69-70 [55 L.Ed. 619, 648-649, 31 S.Ct. 502].)

We conclude that real parties have not carried their burden of showing that the legislative history supports an "unmistakable implication" that sec-

tion 1964(c) limits jurisdiction over RICO claims to federal courts. (*Gulf Offshore Co., supra,* 453 U.S. at p. 478 [69 L.Ed.2d at p. 791].)[3]

■ Real parties next urge that there exists disabling incompatibility between RICO claims and state court adjudication. But they fail to carry their burden on the point, and thus again fall short of rebutting the presumption of concurrent jurisdiction.

■ "The factors generally recommending exclusive federal-court jurisdiction over an area of federal law include the desirability of uniform interpretation, the expertise of federal judges in federal law, and the assumed greater hospitality of federal courts to peculiarly federal claims." (*Gulf Offshore Co., supra,* 453 U.S. at pp. 483-484, fn. omitted [69 L.Ed.2d at p. 795].) None of these factors is shown to be present.

■ First, RICO does not require uniformity in interpretation and application. "The most significant factor in this inquiry is the nature of the federal statute creating the particular cause of action. In other words, a court should determine whether the federal statute is likely to provide the judiciary wide latitude in developing federal rights, or whether the cause of action is sufficiently detailed in its scope and clear as to its purpose that the likelihood of future judicial gloss is comparatively limited." (Redish &

---

[3]Two points may properly be addressed here. First, "although he admits the issue was left unresolved by Congress . . . [Professor Blakey states that] 'courts can infer from the statute that if Congress had thought about it, they would have made jurisdiction exclusive. . . . Had anyone brought up the question' of state court jurisdiction, he surmised, 'we would have said no.'" (Flaherty, *supra,* Nat.L.J. (May 7, 1984), p. 10, col. 2, quoting Professor Blakey.) Professor Blakey's comments do not affect our conclusion that real parties have not carried their burden. To begin with, although Professor Blakey's opinions on what Congress intended or would or should have intended with regard to RICO are certainly entitled to a respectful hearing, they cannot be accorded conclusive effect: on at least one point relating to the interpretation of section 1964(c), they have been found to be "bizarre and wholly unconvincing" (*Kaushal* v. *State Bank of India* (N.D.Ill. 1983) 556 F.Supp. 576, 582; accord, *Sedima, supra,* 741 F.2d at pp. 489-490, fn. 20). Next and dispositive, Professor Blakey's comments establish that Congress did not consider, less still resolve, the question of jurisdiction; what determination it would or should have reached had it dealt with the question is in part mere conjecture and, in any event, altogether immaterial.

Second, in *Kinsey* v. *Nestor Exploration Ltd.-1981A* (E.D.Wash. 1985) 604 F.Supp. 1365, the court held Congress implied that federal jurisdiction over RICO claims is exclusive. The reasoning on which this conclusion rests appears to be as follows: the purpose of the statute is "to halt expansion of organized racketeering activities," and only the federal courts can properly implement the statute's underlying objective. This reasoning, however, is unpersuasive because its fundamental predicate is false. As the Supreme Court declared in *Sedima*—which was decided after *Kinsey*—Congress intended RICO broadly to ensure the integrity of the marketplace, and thus the statute reaches—and indeed has been used almost solely against—"garden variety" fraud. (See — U.S. at pp. ——— [87 L.Ed.2d at pp. 352-361].) Such congressional intent does not support an "unmistakable implication" of exclusivity: state courts have traditionally—and effectively—dealt with such threats to the marketplace's integrity.

Muench, *supra,* 75 Mich.L.Rev. at p. 331.) On the spectrum ranging from open-textured to close-textured statutes, we believe that RICO—under the clarifying reading given it by the Supreme Court in *Sedima*—falls nearer the latter end. "A violation of § 1962(c) . . . requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." (*Sedima, supra,* — U.S. at p. — [87 L.Ed.2d at pp. 358-359], fn. omitted.) On the very face of the statute, the first, second, and fourth elements are indisputably detailed and clear. (See *id.* at pp. ——— [87 L.Ed.2d at pp. 352-361].) The third, it is true, falls below that level of detail and clarity. (See *id.* at p. — [87 L.Ed.2d at p. 361].) The legislative history, however, provides sufficient guidance to limit the scope of judicial gloss. (See *id.* at pp. ——— , fn. 14 [87 L.Ed.2d at pp. 358-359].)[4]

Real parties unpersuasively argue that uniformity is called for because RICO takes aim at a national problem, viz., the costs of crime in the marketplace, deals with uniquely federal issues, and establishes a comprehensive enforcement scheme. Whenever Congress acts other than as the Legislature of the District of Columbia, it attacks what it perceives to be national problems. If the "national" character of a problem necessarily required uniformity, there could never be a presumption of concurrent jurisdiction. Next, real parties are unclear when they assert that the issues RICO deals with are "uniquely federal." If they mean, as they appear to at times, that such issues pertain to a national problem, they merely restate the preceding unsuccessful point. And if they mean, as they appear to at other times, that RICO issues belong exclusively to federal substantive law, they are plainly wrong: the predicate offenses underlying the RICO cause of action encompass violations of state as well as federal criminal law. Finally, the existence of a comprehensive enforcement scheme does not in itself require uniformity and exclusive federal jurisdiction: for example, the Securities Act of 1933 (15 U.S.C. § 77a et seq.) establishes such a scheme (*id.,* § 77s et seq.) and nevertheless grants concurrent jurisdiction (*id.,* § 77v).

Second, federal judges do not appear to have expertise over RICO claims necessarily superior to that of state judges. The offenses underlying the RICO cause of action, as noted, include state as well as federal criminal violations. While federal judges must be presumed to have greater expertise over the latter, state judges must be presumed to have greater expertise over the state law violations.

---

[4]Our conclusion might have been different if RICO contained an amorphous "racketeering injury" requirement akin to the "antitrust injury" requirement with which the federal courts have struggled since the Supreme Court handed down its decision in *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.* (1977) 429 U.S. 477 [50 L.Ed.2d 701, 97 S.Ct. 690]. But as the court recently held in *Sedima,* — U.S. —, — [87 L.Ed.2d at pp. 357-359], RICO contains no such requirement.

Third, state judges cannot be deemed unsympathetic to RICO claims. The states plainly share with the federal government the desire to avoid the costs of crime in the marketplace: 23 states have already enacted "little RICO" statutes, and 6 have such statutes pending (Blakey, *The Act Is Neither Anti-Business Nor Pro-Business, It's Pro-Victim,* Nat.L.J. (Aug. 26, 1985) p. 24, col. 4). Moreover, RICO's predicate offenses include violations of state criminal law; state judges cannot be presumed hostile to claims that may be federal in label only, any more than federal judges would be hostile to claims based on violation of state laws.[5]

We conclude that real parties have not carried their burden of showing "a clear incompatibility between state-court jurisdiction and federal interests." (*Gulf Offshore Co., supra,* 453 U.S. at p. 478 [69 L.Ed.2d at p. 791].)

In sum, concurrent jurisdiction is consistent with the language of the statute, its legislative history, and its structure and substance, and is therefore supported by Congress's express mandate that RICO "be liberally construed to effectuate its remedial purposes" (Pub.L. No. 91-452, § 904(a), 84 Stat. 947). Congress, as Professor Blakey has conceded, evidently did not consider the question of jurisdiction, less still resolve it. Whether, as he has argued, Congress would or should have limited jurisdiction to the federal courts is immaterial to the question before us: Congress simply did not so limit jurisdiction, and we are powerless to do what Congress has failed to do. Accordingly, we hold that real parties have not carried their burden of rebutting the presumption of concurrent jurisdiction, and hence that state courts may entertain RICO claims.

The demurrers to the seventh and eighth causes of action should have been overruled.

### III.

■ The Cartwright Act, as we shall show, applies to the medical profession. Therefore, in sustaining the demurrers to the petitioner's ninth cause of action on that ground, the trial court erred.

If this question were of first impression, we would answer it in the affirmative without hesitation. The Cartwright Act (or Act) provides in relevant

---

[5]Real parties further contend there is incompatibility between RICO claims and state court adjudication on the ground that the private litigant can prosecute his claim more effectively in the federal system. Whether or not the premise is supported as a matter of fact, the argument itself must be rejected. First, no reason or authority is presented in support. Second and more important, its only evident basis is paternalism, and such a basis is foreign to the analysis of the question of jurisdiction.

part that "every trust is unlawful, against public policy and void" (Bus. & Prof. Code, § 16726), and defines a trust as "a combination of capital, skill or acts by two or more persons for any of the following purposes:

"(a) To create or carry out restrictions in trade or commerce.

"(b) To limit or reduce the production, or increase the price of merchandise or any commodity.

"(c) To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.

"(d) To fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this State.

"(e) To make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they do all or any or any combination of any of the following:

"(1) Bind themselves not to sell, dispose of or transport any article or any commodity or any article of trade, use, merchandise, commerce or consumption below a common standard figure, or fixed value.

"(2) Agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure.

"(3) Establish or settle the price of any article, commodity or transportation between them or themselves and others, so as directly or indirectly to preclude a free and unrestricted competition among themselves, or any purchasers or consumers in the sale or transportation of any such article or commodity.

"(4) Agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected." (*Id.*, § 16720.)

The plain language of the Act reveals that the statute is comprehensive in its attack on threats to competition, and thereby implies that its coverage extends to all economic combinations, regardless of the nature of the occupation of the combining parties and regardless of whether the occupation has a nonprofit, public service aspect.

The Act is broad in scope: "[it] is 'couched in . . . comprehensive language' and 'forbids combinations of the kind described with respect to *every* type of business.'" (*Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 928 [130 Cal.Rptr. 1, 549 P.2d 833], quoting *Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34, 43 [172 P.2d 867], italics added.) The Act also reaches deep in proscribing anticompetitive conduct: it prohibits two or more persons "[t]o make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they . . . [a]gree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any . . . article or commodity, that its price *might in any manner* be affected." (Bus. & Prof. Code, § 16720, subd. (e)(4), italics added.) In so doing, the Act reaches beyond the Sherman Act to threats to competition in their incipiency—much like section 7 of the Clayton Act, which prohibits mergers that "*may* . . . substantially . . . lessen competition, or . . . *tend* to create a monopoly" (15 U.S.C. § 18, italics added)—and thereby goes beyond "clear-cut menaces to competition" in order to deal with merely "ephemeral possibilities" (*Brown Shoe Co.* v. *United States* (1962) 370 U.S. 294, 323 [8 L.Ed.2d 510, 534, 82 S.Ct. 1502] [§ 7 of Clayton Act]).

Even if the plain language of the Act does not compel the conclusion that the professions are within its coverage, the Act must be construed to have such a coverage. The statutory language is comprehensive in its scope; it would therefore do violence to such language to limit the applicability of the Act on the ground that because the professions are not expressly included, they are necessarily excluded. Indeed, under the rule of *expressio unius est exclusio alterius* (see, e.g., *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 195 [132 Cal.Rptr. 377, 553 P.2d 537]), the Act should be construed to apply to the professions: since labor organizations are expressly excluded from the statute (see Bus. & Prof. Code, § 16703), other groups not exempted should be deemed included. Further, the statutory language speaks solely in terms of economic effects; it would similarly do violence to such language to read in an exclusion that turns on the nature of the economic occupation of the persons who may cause such effects.

That the professions are within the coverage of the Cartwright Act is revealed also by its purpose. Consumer welfare is a principal, if not the sole, goal of antitrust laws. (*Marin County Bd. of Realtors, Inc.* v. *Palsson, supra,* 16 Cal.3d at p. 935; see, e.g., *National Soc. of Professional Engineers* v. *U. S.* (1978) 435 U.S. 679, 686-696 [55 L.Ed.2d 637, 646-653, 98 S.Ct. 1355]; see generally 1 Areeda & Turner, Antitrust Law (1978) [¶¶ 103-113, at pp. 7-33; Bork, The Antitrust Paradox (1978) pp. 50-89 [the "single goal of [antitrust laws] is consumer welfare"].) In other words, "[a]ntitrust laws are designed primarily to aid the consumer. They rest 'on

the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions.'" (*Marin County Bd. of Realtors, Inc.* v. *Palsson, supra,* at p. 935, quoting *Northern Pac. R. Co.* v. *United States* (1958) 356 U.S. 1, 4 [2 L.Ed.2d 545, 549, 78 S.Ct. 514].) It is beyond question that the consumer's interests are significantly implicated in the provision of services by the professions—and perhaps especially so in services by the medical profession.

The intent of the Legislature that enacted the Cartwright Act, as we are able to reconstruct it, also reveals that the Act applies to the professions. While no direct sources for the legislative history of the Cartwright Act exist, we may reasonably assume that the Legislature's intent was substantially similar to that of United States Senator John Reagan, who authored an unsuccessful bill offered as a substitute for what became the Sherman Act; the Cartwright Act is a "near carbon cop[y]" of the Reagan bill (*Marin County Bd. of Realtors, Inc.* v. *Palsson, supra,* 16 Cal.3d at p. 926).

At the very least, the Sherman Act codified the common law. (Letwin, *Congress and the Sherman Antitrust Law: 1887-1890* (1956) 23 U.Chi. L.Rev. 221, 255-258; see, e.g., *Marin County Bd. of Realtors, Inc.* v. *Palsson, supra,* at p. 925 ["the Sherman Act . . . ha[s] [its] roots in the common law"].) The Reagan bill was intended to reach further. "The record of congressional debates reveals that [the Reagan bill] was designed not to narrow the scope of the Sherman Act but to broaden it. Its author . . . declared, 'I confess to a little surprise at the suggestion . . . that the amendment which I have submitted is different in character from the measure which he has reported . . . .' (21 Cong. Rec. 2564 (Mar. 24, 1890).) Indeed, he explained, 'I have tried . . . to see if we could not devise a law that would arrest and prevent these trusts as far as the jurisdiction of Congress would go.' (21 Cong. Rec. 2645 (Mar. 26, 1890).)" (*Marin County Bd. of Realtors, Inc.* v. *Palsson, supra,* at p. 926.)

At common law the professions were recognized as trades for the purposes of regulation of economic activity. (See, e.g., *Cook* v. *Johnson* (1879) 47 Conn. 175, 175-178 [medicine]; *Haldeman* v. *Simonton* (1880) 55 Iowa 144, 144-146 [7 N.W. 493] [medicine]; *Gilman* v. *Dwight* (1859) 79 Mass. 356, 359 [medicine]; *Sainter* v. *Ferguson* (C.P. 1849) 7 Man., Grang. & Scott 716, 62 Eng. Com.L.Rep. 716 [medicine]; *Nicholls* v. *Stretten* (Q.B. 1847) 10 Ad. & El.N.S. 346, 59 Eng.Com.L.Rep. 344 [law]; *Horner* v. *Graves* (K.B. 1831) 7 Bing. 735, 20 Eng.Com.L.Rep. 310 [medicine]; see generally *United States* v. *American Medical Ass'n* (D.C.Cir. 1940) 110

F.2d 703, 709-711, cert. den. 310 U.S. 644 [84 L.Ed. 1411, 60 S.Ct. 1096] [medicine].) The proposition is supported perhaps no more plainly than by the discussion of the Supreme Judicial Court of Massachusetts in *Gilman* v. *Dwight:* reasoning that "[t]here is nothing in the nature of the business or profession to which the contract relates, which takes it out of the ordinary rules applicable to contracts in partial restraint of trade," the court expressly held that such rules are applicable to "attorneys, solicitors, apothecaries, dentists and surgeons." (79 Mass. at p. 359.)

Thus, it must be assumed that Senator Reagan intended his bill to apply to the professions, and it may reasonably be assumed that in enacting the Cartwright Act, the California Legislature had a similar intent.

In the foregoing discussion, we have observed that the Cartwright Act is broader in range and deeper in reach than the Sherman Act, and have concluded on that basis that it applies to the professions. But even if the Cartwright Act were merely coterminous with the Sherman Act, our conclusion would be the same.

In *Goldfarb* v. *Virginia State Bar* (1975) 421 U.S. 773 [44 L.Ed.2d 572, 95 S.Ct. 2004], the United States Supreme Court addressed the question whether the professions (in that case the practice of law) are within the coverage of section 1 of the Sherman Act.[6] Answering it in the affirmative, the court reasoned as follows: "In arguing that learned professions are not 'trade or commerce' the County Bar seeks a total exclusion from antitrust regulation. . . . We cannot find support for the proposition that Congress intended any such sweeping exclusion. The nature of an occupation, standing alone, does not provide sanctuary from the Sherman Act [citation], nor is the public-service aspect of professional practice controlling in determining whether § 1 includes professions. [Citation.] Congress intended to strike as broadly as it could in § 1 of the Sherman Act, and to read into it so wide an exemption as that urged on us would be at odds with that purpose. [¶] The language of § 1 of the Sherman Act, of course, contains no exception . . . . And our cases have repeatedly established that there is a heavy presumption against implicit exemptions." (*Id.* at p. 787 [44 L.Ed.2d at p. 585].)

We find the *Goldfarb* reasoning to be applicable to the Cartwright Act and persuasive. First, as shown by the plain meaning of the statutory language, the evident implication of such language, and the manifest purpose

---

[6]Section 1 of the Sherman Act provides in relevant part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal . . . ." (15 U.S.C. § 1.)

of the Act, the Legislature intended to strike as broadly as it could in the Cartwright Act; to read into it a total exclusion from antitrust regulation for the professions would be at odds with that intent. Second, as the same evidence implies, neither the nature of a profession nor its public service aspect is sufficient to exclude it from the reach of the antitrust laws. Third, the language of the Act contains no exception for the professions, and there is a heavy presumption against implicit exemptions. (See *Marin County Bd. of Realtors, Inc.* v. *Palsson, supra,* 16 Cal.3d at pp. 927-928 [reasoning in effect that the Legislature intended to exclude from the Act only what the Act expressly excludes].)

At the beginning of our discussion, we observed that if the question whether the Cartwright Act applies to the professions were of first impression, we would answer it in the affirmative without hesitation. The question, however, is not new. In *Willis* v. *Santa Ana etc. Hospital Assn.* (1962) 58 Cal.2d 806 [26 Cal.Rptr. 640, 376 P.2d 568], this court held that the professions are not within the Act's coverage. The court based its conclusion on the following reasoning: first, because the professions are not expressly included in section 16720, courts must look outside the Act to determine the question; second, Business and Professions Code section 16600, which provides in substance that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void," expressly covers the professions, and the Cartwright Act's failure to do so suggests it was not intended to apply to them; and third, the Act does not clearly embrace the professions, and in view of its quasi-penal character it should not be construed to do so. (*Id.* at p. 809.)

*Willis* has been subjected to criticism on its own terms and also in light of the United States Supreme Court's subsequent holding in *Goldfarb* and our otherwise liberal construction of the Cartwright Act. (Note, *Should the Medical Profession Be Exempt from California Antitrust Law? Willis v. Santa Ana Community Hospital Association Reexamined* (1979) 7 Western St. U. L.Rev. 91 [hereafter *Willis Reexamined*]; Folsom & Fellmeth, Cal. Antitrust Law and Practice (1983) § 17 [hereafter Folsom & Fellmeth].) We must reexamine the holding in *Willis* to determine its continuing viability.

The reasoning in *Willis,* we conclude, is unsound and its holding must be rejected. First, the Cartwright Act's failure to expressly include the professions may not be used to direct attention outside the Act and thus indirectly to support the proposition that the Act excludes the professions. Language, purpose, and legislative intent, as we have explained above, establish that in this regard the Act includes what it does not expressly exclude.

Second, the opinion's use of section 16600 as an aid to the construction of the Cartwright Act is unconvincing. The opinion declares: "It is signif-

icant that, in related legislation added to the Business and Professions Code at the same time as the Cartwright Act, the word 'profession' was included among the terms describing the scope of the legislation, notwithstanding the fact that the words 'trade' and 'business' were also used. [Citation.] The difference in terminology between this section and the Cartwright Act may be viewed as indicating that the act was not intended to apply to the professions." (58 Cal.2d at p. 809.)

On closer examination, however, the two code sections are not sufficiently related to support the result the opinion reaches. "Section 16600 . . . was first enacted in 1872 and was placed at section 1673 of the Civil Code. On the other hand, section 16720 . . . was first enacted in 1907 as part of the then uncodified Cartwright Act and was patterned after the federal Sherman Act, with identical 'trade or commerce' language . . . . [¶] The California Business and Professions Code came into existence in its present general form in 1937. The relevant portions of the Cartwright Act and Civil Code section 1673 were moved into this, then new, codification in 1941. It is significant that these two code sections were not *new* enactments '*added*' to the Business and Professions Code in 1941. Rather, they were the result of the Legislature engaging in statutory consolidation. Under these circumstances, a finding of legislative intent to exclude the professions from the Cartwright Act, based upon nothing more than language differences between the two code sections, exceeds the limits of plausible inference." (*Willis Reexamined, supra,* 7 Western St. U. L.Rev. at pp. 102-103, italics in original, fns. omitted.)

Third, the opinion in *Willis* unpersuasively reasons that as a quasi-penal statute, the Cartwright Act should be construed not to apply to the professions because it fails to include them in clear terms. The reasoning is unsound because its underlying premise is unsupported: as we have explained above, the Act clearly, albeit not expressly, includes the professions.

Real parties and amici curiae seek to prevent the conclusion that the Cartwright Act applies to the medical profession by means of two further arguments. First, they urge, the profession is regulated by the state and as such is impliedly exempted from the Act. But because the regulatory scheme to which the medical profession is subject is not wholly inconsistent with antitrust principles, there is no such implicit exemption. (Cf. *MCI Communications* v. *American Tel. & Tel. Co.* (7th Cir. 1983) 708 F.2d 1081, 1101, cert. den. 464 U.S. 891 [78 L.Ed.2d 226, 104 S.Ct. 234] [federal regulatory scheme for telecommunications and Sherman Act].)

Second, they contend that because the Legislature acted on the Cartwright Act in 1976 and 1984 without altering the provision that *Willis* had con-

strued, it must be presumed to have been aware of and to have acquiesced in the *Willis* holding. The claim is unpersuasive. ■ "Legislative silence after a court has construed a statute gives rise at most to an arguable inference of acquiescence or passive approval, the weaknesses of which have been exposed elsewhere. But something more than mere silence should be required before that acquiescence is elevated into a species of implied legislation . . . ." (*People* v. *Daniels* (1969) 71 Cal.2d 1119, 1127-1128, fn. omitted [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677].) Here there is nothing more than mere silence.[7]

What is perhaps at the root of the contentions of real parties and amici curiae in support of the holding in *Willis* is an implicit contention that the doctrine of stare decisis prevents our reconsideration of the issue. If so, their point is without merit.

In *Boys Markets* v. *Clerks Union* (1970) 398 U.S. 235 [26 L.Ed.2d 199, 90 S.Ct. 1583], the United States Supreme Court rejected a similar contention in deciding to review and overrule its decision in *Sinclair Refining Co.* v. *Atkinson* (1962) 370 U.S. 195 [8 L.Ed.2d 440, 82 S.Ct. 1328], which held that section 4 of the Norris-LaGuardia Act (29 U.S.C. § 104) bars a federal district court from enjoining a strike in breach of a no-strike clause in a collective-bargaining agreement, even though the agreement contains binding arbitration provisions enforceable under section 301(a) of the Labor Management Relations Act (*id.* § 185(a)). The court reasoned: "We do not agree that the doctrine of *stare decisis* bars a re-examination of *Sinclair* in the circumstances of this case. We fully recognize that important policy considerations militate in favor of continuity and predictability in the law. ■ Nevertheless, as Mr. Justice Frankfurther wrote for the Court, '[*S*]*tare decisis* is a principle of policy and not a mechanical formula of adherence

---

[7]In 1976 the Legislature added sections 16721 and 16721.5 to the Business and Professions Code. (Stats. 1976, ch. 1247, §§ 1 & 2, pp. 5574-5575.) In so doing it did not act on section 16720—the provision construed in *Willis*—and implied no approval of that decision. "Section 16721 prohibits exclusionary discrimination in business transactions on the basis of sex, religion, race, creed, color, national origin, ancestry or location of business. . . . Section 16721.5 prohibits exclusionary discrimination in letters of credit and contracts for goods and services. [¶] Both of these technically drafted sections appear to have arisen in response to the Arab boycott against Israel, as a means to prevent compliance with the boycott by California firms." (Folsom & Fellmeth, *supra*, § 9, p. 7.)

In 1984 the Legislature passed Assembly Bill No. 707, 1983-1984 Regular Session, which was vetoed by the Governor and subsequently reintroduced without relevant change as Assembly Bill No. 707, 1985-1986 Regular Session. Here too it did not act on section 16720 and implied no approval of the *Willis* holding. The bill would among other things add section 16770 to the Business and Professions Code. Under this provision, it is only the *formation* of health care services organizations that would be exempt from state and federal antitrust laws, *not* the *conduct* of such organizations. By drafting such a limited exemption for such organizations the Legislature cannot be understood to have approved the blanket exemption this court created in *Willis*.

to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience.' [Citations.] It is precisely because *Sinclair* stands as a significant departure from our otherwise consistent emphasis upon the congressional policy to promote the peaceful settlement of labor disputes through arbitration and our efforts to accommodate and harmonize this policy with those underlying the anti-injunction provisions of the Norris-LaGuardia Act that we believe *Sinclair* should be reconsidered. Furthermore, in light of developments subsequent to *Sinclair*, in particular our decision in *Avco Corp.* v. *Aero Lodge 735,* 390 U.S. 557 (1968), it has become clear that the *Sinclair* decision does not further but rather frustrates realization of an important goal of our national labor policy." (398 U.S. at pp. 240-241, fns. omitted [26 L.Ed.2d at pp. 204-205].)

For each of the reasons stated by the Supreme Court, stare decisis does not prevent us from reconsidering *Willis.* Although the doctrine does indeed serve important values, it nevertheless should not shield court-created error from correction. *Willis* should be reexamined because it is inconsistent with our otherwise liberal construction of the Cartwright Act and its underlying policy of consumer welfare. Moreover, in light of the subsequent unanimous decision of this court in *Marin County Board of Realtors, Inc.* v. *Palsson, supra,* 16 Cal.3d 920, *Willis* clearly stands merely as an aberration, an obstacle to the attainment of the legislative goal of free and open competition.

Not only is it altogether proper for us to reexamine *Willis,* it would be improper not to do so. Since that decision, the Legislature has not acted on that precise matter. Its "failure to act may indicate many things other than approval of a judicial construction of a statute . . . ." (*County of Los Angeles* v. *Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 391, 404 [179 Cal.Rptr. 214, 637 P.2d 681]; accord, *People* v. *Daniels, supra,* 71 Cal.2d at p. 1127, fn. 4.) "But while the Legislature may thus choose to remain silent, we may not. It continues to be our duty to decide each case that comes before us; in so doing, we must apply every statute in the case according to our best understanding of the legislative intent; and in the absence of further guidance by the Legislature, we should not hesitate to reconsider our prior construction of that intent whenever such a course is dictated by the teachings of time and experience. . . . [T]he rule of deference to legislative judgment applies to the statute 'as interpreted by this court.' It is this judicial interpretation, and not the wisdom of the statute itself, that is here in issue; and if we conclude we should now revise that interpretation, we have both the power and the duty to do so. [Citations.] Respect for the role of the judiciary in our tripartite system of government demands no less." (*People* v. *Daniels, supra,* at p 1128.)

For the foregoing reasons, we overrule *Willis* and hold that the Cartwright Act applies to the professions.[8]

The demurrers to the ninth cause of action should have been overruled.

Let a peremptory writ of mandate issue as prayed.

Bird, C. J., Broussard, J., Reynoso, J., and Kawaichi, J.,* concurred.

**LUCAS, J.,** Concurring and Dissenting.—I concur in the majority's conclusion that the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) applies to the medical profession.

I respectfully dissent, however, to the majority's holding that state courts have concurrent jurisdiction with federal courts over civil claims under the Racketeer Influenced and Corrupt Practices Act (RICO). (18 U.S.C. § 1961 et seq.) I would hold not only that the legislative history of RICO establishes exclusive federal jurisdiction, but also that concurrent jurisdiction is clearly incompatible with the federal interests RICO is intended to advance.

The majority correctly observes that the issue of RICO jurisdiction is one of first impression in this state. Four other courts have addressed this issue, however, and three of them, after examining RICO's legislative history and compatibility with federal interests, have concluded that federal courts have exclusive jurisdiction over civil RICO claims.[1] The fourth court stated that jurisdiction is presumptively concurrent, but did so without any analysis of the relevant factors.[2] After analyzing the statute as a whole, its language,

---

[8] By concluding that the professions are within the scope of the Cartwright Act we do not imply that they are indistinguishable for antitrust purposes from other businesses. In *Goldfarb* the Supreme Court cautioned: "The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently." (421 U.S. at pp. 788-789, fn. 17 [44 L.Ed.2d at p. 585].) The same reasoning is applicable within the context of the Cartwright Act.

*Assigned by the Chairperson of the Judicial Council.

[1] The three cases holding that the presumption of concurrent jurisdiction over civil RICO claims was rebutted are *County of Cook* v. *Midcon Corp.* (N.D.Ill. 1983) 574 F.Supp. 902, 909-912; *Greenview Trading* v. *Hershman & Leicher, P.C.* (1985) 108 App.Div.2d 468 [489 N.Y.S.2d 502]; and *Kinsey* v. *Nestor Exploration Ltd.-1981A* (E.D.Wash. 1985) 604 F.Supp. 1365, 1370-1371.

[2] See *Luebke* v. *Marine Nat. Bank of Neenah* (E.D.Wis. 1983) 567 F.Supp. 1460.

legislative history, and compatibility with federal interests, I, too, conclude that civil RICO claims may be heard only in federal courts.

Although there is no *express* provision in RICO conferring exclusive federal jurisdiction over civil claims, 18 United States Code section 1964(c), establishing a civil cause of action under RICO,[3] tracks virtually word-for-word section 4 of the Clayton Act (15 U.S.C. § 15),[4] which creates a civil cause of action under federal antitrust laws. As the majority notes in its review of RICO's legislative history, both the American Bar Association and Representative Steiger proposed to the House Judiciary Committee the addition to RICO of a private treble damages action similar to that found in antitrust laws. (*Ante,* p. 912.) The treble damages provision which was added to RICO was described by RICO's sponsor as providing that "private persons injured by reason of a violation of the title may recover treble damages in Federal courts—another example of the antitrust remedy being adapted for use against organized criminality." (Remarks of Congressman Poff, 116 Cong.Rec. 35295 (1970).) Thus, RICO's legislative history demonstrates how Congress purposefully modeled section 1964(c) after the antitrust treble damages provision. Courts uniformly have held that this latter provision confers exclusive federal jurisdiction. This interpretation is significant because "it is well established that the identity in language between 18 U.S.C. § 1964(c) and 15 U.S.C. § 15 is not a mere happenstance; Congress consciously patterned the RICO section after the antitrust prototype. See, e.g., 115 Cong. Rec. 6992, 6993 (1969) (statement of Sen. Hruska). Legislators must have known that courts have construed virtually identical language as giving federal courts exclusive jurisdiction over antitrust claims." (*County of Cook* v. *Midcon Corp., supra,* 574 F.Supp. at p. 912; see also, *Greenview Trading* v. *Hershman & Leicher, P.C., supra,* 489 N.Y.S.2d at pp. 504-505.) As have the only other courts analyzing the matter, I find this identity in language between RICO and its antitrust prototype provides an inescapable implication that Congress intended that federal courts have exclusive jurisdiction over civil RICO claims.

In addition to the specific language of 18 United States Code section 1964(c), examination of RICO as a complete statutory scheme further demonstrates Congress' intent to restrict jurisdiction. RICO provides federal

---

[3]Section 1964(c) states: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

[4]Section 15 states: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of the suit, including a reasonable attorney's fee."

courts with expanded ability to compel parties and witnesses from other jurisdictions to appear (18 U.S.C. §§ 1965(b), (c)) and the power to compel forfeiture and divestment (*id.*, § 1964(a)). Under the scheme a number of predicate acts are defined in terms of substantive federal crimes. (*Id.*, § 1961.) Thus in formulating the overall approach, Congress made use of peculiarly federal powers and definitions. As the court in *Kinsey* v. *Nestor Exploration Ltd.-1981A, supra,* 604 F.Supp. 1365, explained, "where overall congressional intent is patently obvious; *viz.,* to halt expansion of organized racketeering activities, it would seem more desirable, if not jurisprudentially required, to read all RICO provisions *in pari materia,* and to conclude that Congress could not have intended the untoward result of creating a wholly new cause of action triable in state courts across the country, while at the same time mandating that federal substantive law governs such actions, and at the same time reserving exclusively to the federal government the procedural power necessary to implement the underlying objective." (P. 1371, fns. omitted.) The *Kinsey* court's analysis makes sense. By extending the federal court's venue and process powers as well as by utilizing federal definitions as a substantive part of RICO, Congress must have regarded RICO as creating a cause of action triable exclusively in federal courts. The expanded powers provide federal courts with expanded ability to attack both the individuals and the organizations involved in racketeering activities.

As real parties urged, exclusive federal jurisdiction over civil RICO claims is analytically appropriate because RICO addresses a national problem and deals with uniquely federal issues. The majority's response to this argument falls short. The comment that, except when acting as the Legislature of the District of Columbia, Congress always addresses what it perceives to be a national problem, begs the question. (*Ante,* p. 915.)

Looking back to the original purpose of RICO is instructive. As one federal court has observed, "It is clear that the civil provisions of RICO were not enacted for the purpose of imposing federal liability for state business fraud claims. The primary intent of Congress in enacting 18 U.S.C. § 1962 was to combat the infiltration of organized crime into legitimate businesses operating in interstate commerce. [Citation omitted.]" (*Seville Indus. Mach.* v. *Southmost Mach. Corp.* (D.C.N.J. 1983) 567 F.Supp. 1146, 1157.) In enacting RICO, Congress intended to do more than describe just another violation. Its intentions were broad in sweep: to find a method of attacking criminal schemes on an overall basis rather than case-by-case or crime-by-crime. As the Supreme Court recently observed, "RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime." (*Sedima, S.P.R.L.* v. *Imrex Co.* (1985) — U.S. —

[87 L.Ed.2d 346, 360, 105 S.Ct. 3275].) This interest is reflected not only in the concentration on interstate commerce and the effects of the proscribed conduct on such commerce, but also in the broad procedural and jurisdictional powers awarded federal district courts by RICO itself.

The majority's reliance on a comparison of RICO's enforcement scheme to that of the Securities Act of 1933 (15 U.S.C. § 77a et seq.) is inapposite. (*Ante*, p. 915.) The sections cited by the majority refer to an enforcement scheme that can be carried out *only* by the Securities and Exchange Commission rather than by the courts. RICO's enforcement scheme includes grants of enlarged procedural powers to federal courts—powers that can assist *individuals* bringing civil RICO actions. The existence of RICO's enforcement scheme invokes the need for exclusive federal jurisdiction because the broader jurisdictional and subpoena powers provided are available to the plaintiff *only* in a federal RICO action.

My colleagues also point out that RICO predicate offenses include violations of state law. Their focus, however, is on the trees and they have missed the forest. While particular state and federal crimes may provide the predicate offenses for finding a RICO violation, they are not, in and of themselves, a sufficient basis for finding a RICO-defined violation has occurred. In order to do that, a "pattern" as described in the act must be established. Thus, the particular origins of the underlying individual crimes are not significant.[5] The purpose of RICO is to prevent and punish wide-reaching criminal schemes. To this end Congress has provided to the federal courts broader jurisdictional and subpoena powers which cross normal jurisdictional boundaries. Congress has no ability similarly to extend the reach of state courts. By permitting state courts, with more truncated powers, to attempt to act in concert with the federal court, the majority may well be defeating the purpose of RICO. For example, two simultaneous actions could take place against the same defendant—one state, one federal. If the state action with its narrower reach and focus ends first, will it preclude those elements used for the state court's RICO finding being used in the federal action charging a more comprehensive and interstate scheme? The majority does not even approach a discussion of such questions.

It is true that a presumption of concurrent jurisdiction can be rebutted by "unmistakable implication from legislative history." (*Gulf Offshore Co.* v. *Mobil Oil Corp.* (1981) 453 U.S. 473, 478 [69 L.Ed.2d 784, 791, 101 S.Ct.

---

[5]This conclusion is highlighted by the Supreme Court's recent holding in *Sedima* that the "racketeering injury" required by the act is satisfied by the harm caused by the predicate acts. As Justice White expressly commented: "Conducting an enterprise that affects interstate commerce is obviously not in itself a violation of § 1962, nor is mere commission of the predicate offenses." (— U.S. at p. — [87 L.Ed.2d at p. 359].)

2870].) Unlike my colleagues, however, I find such an "unmistakable" indication of Congress' intent to confine jurisdiction to the federal courts in the purposeful patterning of the RICO statute after the antitrust statute, convincing evidence that is buttressed by examining the statute as a whole with its federal definitions and exclusively federal procedural powers designed to attack a national problem. As Professor G. Robert Blakey, chief counsel to the Senate subcommittee which proposed RICO, stated, "[C]ourts can infer from the statute that if Congress had thought about it, they would have made jurisdiction exclusive." (Flaherty, *Two States Lay Claim to RICO* (May 7, 1984) Nat. L.J. at p. 10, col. 2, quoting Professor Blakey.) While Professor Blakey's comments are not binding, they bear analytic force which I find persuasive.

In addition to factors inherent in the fashioning of the legislation itself, several relevant policy considerations also favor finding exclusive jurisdiction. For example, as the majority correctly notes, one factor to be considered in deciding whether concurrent jurisdiction is incompatible with federal interests is the likelihood of uniform interpretation of the statute by state and federal courts. (*Ante*, p. 914.) The majority rejects the idea that RICO requires exclusive federal jurisdiction to ensure uniformity in interpretation and application, claiming instead that the statute is sufficiently clear and detailed to "limit the scope of judicial gloss." (*Ibid.*) In actuality, just the opposite is true. As one court has observed, RICO "is constructed on the model of a treasure hunt." (*Sutliff, Inc. v. Donovan Companies, Inc.* (7th Cir. 1984) 727 F.2d 648, 652.) My colleagues completely ignore the existing ample evidence that this statute is far from crystal clear. RICO is an extremely complex statute which has already produced significant conflicting opinions in numerous areas in federal courts.[6] Referring to the large number of civil RICO actions against legitimate businesses, and the much smaller number of civil RICO actions against professional criminals, Justice White very recently observed, "The 'extraordinary' uses to which civil RICO has been put appear to be primarily the result of the breadth of the

---

[6]In interpreting RICO as applied to private rights of action, federal courts have reached different results on numerous questions such as: Must a plaintiff in a civil RICO action show injury by at least two acts of racketeering to be able to recover? (Compare *Econo-Car Intern. v. Agency Rent-A-Car* (D.C.Mass. 1984) 589 F.Supp. 1368, 1374 [yes] with *Haroco v. American Nat. B. & T. Co. of Chicago* (7th Cir. 1984) 747 F.2d 384, 397-398 [no].) Is freezing of assets available as preliminary injunctive relief in a civil RICO action? (Compare *USACO Coal Co. v. Carbomin Energy, Inc.* (6th Cir. 1982) 689 F.2d 94, 96-98 [yes] with *Ashland Oil, Inc. v. Gleave* (W.D.N.Y. 1982) 540 F.Supp. 81, 82-85 [no].) Do treble damages survive the death of the alleged wrongdoer in civil RICO action? (Compare *State Farm Fire and Cas. Co. v. Estate of Caton* (N.D.Ind. 1982) 540 F.Supp. 673, 677-682 [because they are remedial in nature, treble damages survive] with *Summers v. Federal Deposit Ins. Corp.* (W.D.Okla. 1984) 592 F.Supp. 1240, 1243 [because they are essentially penal here, they do not survive].)

predicate offenses, in particular the inclusion of wire, mail, and securities fraud, *and the failure of Congress and the courts to develop a meaningful concept of 'pattern' [of racketeering activity]."* (*Sedima, S.P.R.L.* v. *Imrex Co., supra,* — U.S. —, — [87 L.Ed.2d 346, 361], italics added.) The court in *Sedima* noted that three members of the House Judiciary Committee dissented to the private treble damages provision amendment to RICO because they "feared the treble damages would be used for malicious harassment of business competitors." (*Id.,* at p. — [87 L.Ed.2d at p. 353].) These fears appear to have come true—the court in *Sedima* observed that private civil RICO actions are being brought almost solely against legitimate businesses, rather than the archetypal mobster. (*Id.,* at p. — [87 L.Ed.2d at p. 361].) These businesses, facing ruinous financial exposure, have a strong interest in settling even meritless cases. Thus RICO may be used for the same sort of extortive purposes it was designed to attack. (Report of the Ad Hoc Civil RICO Task Force of the ABA Section of Corporation, Banking and Business Law 69 (1985).) The failure of Congress and the courts to develop a meaningful concept of "pattern" has allowed civil RICO to be used in ways Congress never intended. Concurrent jurisdiction over civil RICO claims would bring state courts into the already divided arena of RICO interpretation, producing even more discordant interpretations and unintended uses of the statute.

. Not only does adjudication of RICO claims involve interpretation of the RICO statute itself, but often it will also necessitate interpretation of other federal statutes which constitute predicate offenses. (Flaherty, supra, at p. 3, col. 2.) This requirement further supports the need for exclusive federal jurisdiction to ensure uniform interpretation and application. I concur with the court in *Greenview Trading* v. *Hershman & Leicher, P. C., supra,* 489 N.Y.S.2d at page 506, which concluded, "What quickly emerges from a study of the statute is that the adjudication of civil RICO claims involves not just the interpretation of a single Federal statute, however complicated, but rather the interpretation and application of a number of Federal statutes that constitute predicate offenses, statutes with which the Federal courts are obviously far more familiar from ongoing experience than State courts. . . . [¶] We are in agreement with Professor Blakey that Congress did not intend to involve State courts so deeply in the interpretation of a host of Federal statutes, and we are persuaded that the better conceptual analysis of the problem points against concurrent jurisdiction for the State courts."

This is, undoubtedly, an interesting area. RICO provides an additional weapon in the armament for attacking significant and complex criminal activities. Nonetheless, seductive as it may seem to join in the RICO fray, the majority fails to demonstrate that state courts are so permitted. For the

foregoing reasons, I would hold that federal courts have exclusive jurisdiction over civil RICO claims.

Grodin, J., concurred.