Filed 11/6/20; Opinion on transfer from Supreme Court

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| QUIDEL CORPORATION, Petitioner, v. THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent; BECKMAN COULTER, INC., Real Party in Interest. | D075217 (Super. Ct. No. 37-2017-00044865-CU-AT-CTL) |

ORIGINAL PROCEEDING in mandate challenging an order of the Superior Court of San Diego County, Gregory W. Pollack, Judge. Petition granted.

Horvitz & Levy, Jeremy B. Rosen, Robert H. Wright, Stanley H. Chen; Charis Lex, Sean P. Gates, Eugene Illovsky, Douglas J. Beteta; Kesselman Brantly Stockinger, Amy T. Brantly and Trevor V. Stockinger, for Petitioner.

No appearance for Respondent.

California Appellate Law Group, Anna-Rose Mathieson, Susan Horst; Behmer & Blackford, Timothy S. Blackford; Williams & Connolly, John E. Schmidtlein and Carl R. Metz, for Real Party in Interest.

Quidel Corporation (Quidel) has petitioned for a writ of mandate and/or prohibition directing the trial court to vacate its order granting summary adjudication. Quidel contends the trial court incorrectly concluded a provision in its contract with Beckman Coulter, Inc. (Beckman) was an invalid restraint on trade in violation of Business and Professions Code,[1] section 16600. Quidel argues the trial court improperly extended the holding from *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937 (*Edwards*) beyond the employment context to a provision in the parties' 2003 BNP Assay Agreement (the Agreement). We are called upon to determine whether the trial court's per se application of section 16600 to section 5.2.3 of the Agreement between Quidel and Beckman was correct. In our original, published opinion, we concluded it was not. We granted the petition and issued a writ instructing the trial court to vacate the December 7, 2018 order granting summary adjudication on the first cause of action.

The California Supreme Court granted review of our opinion and ordered briefing deferred pending its decision in *Ixchel Pharma, LLC v. Biogen, Inc.,* S256927. On August 3, 2020, the court issued *Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130 (*Ixchel*), which held "a rule of reason applies to determine the validity of a contractual provision by which a business is restrained from engaging in a lawful trade or business with another business." (*Id.* at p. 1162.) After the court issued its opinion in

---

[1] Future section references are to the Business and Professions Code unless otherwise specified.

*Ixchel*, it transferred this matter to this court with directions to vacate our previous opinion and reconsider the case in light of its opinion in *Ixchel*.

We have followed the court's directions and now issue a new opinion in which we conclude the trial court's decision was incorrect. We will direct the trial court to vacate the December 7, 2018 order granting summary adjudication on the first cause of action.

FACTUAL BACKGROUND

In 1996, Biosite Inc. (Biosite)[2] licensed patent rights and know-how related to a B-type natriuretic peptide (BNP), which can be measured in a person's blood. The semi-exclusive licensing agreement allowed Biosite to develop an immunoassay to determine the level of BNP in a person's blood sample, to help diagnose congestive heart failure. After acquiring the intellectual property rights and know-how, Biosite developed and created a BNP assay for use with its point-of-care analyzer device, and it obtained regulatory approval. BNP assays only work on the analyzer for which they are designed.

By 2003, Beckman had developed a laboratory analyzer, but it did not have a license for a BNP assay compatible with its analyzer. Around this same time, other companies were also pursuing BNP assays for use with their larger analyzers, which could run multiple, different immunoassays at higher volumes than the point-of-care analyzer Biosite had. One company was also developing an assay to detect NT-proBNP, a closely-related assay that is a potential direct substitute for the BNP assay and is also based on B-protein.

---

[2]    As a result of acquisitions, Quidel is the successor in interest to Biosite, and Quidel is the current counter-party to Beckman under the BNP Assay Agreement.

If Biosite were to correlate a new BNP assay for use with the Beckman lab analyzer to its Federal Drug Administration-approved BNP assay, it could avoid the need to establish the new assay's efficacy through extensive clinical trials. Collaborating would mean Biosite could expand its customer base to those who wanted to use the larger capacity laboratory analyzers and Beckman could include the BNP assay in its menu of immunoassay offerings.

Biosite and Beckman, each represented by legal counsel, negotiated the Agreement over several months, and they exchanged numerous drafts before executing it on June 24, 2003. Under the terms of the Agreement, Beckman manufactured the BNP assay for Biosite using proprietary materials that Biosite provided, including the antibodies Biosite had developed. In exchange, Biosite purchased its requirements of the BNP assay from Beckman. The Agreement prohibited Biosite from engaging other manufacturers to provide the BNP assay for their competing lab analyzers. The term of the Agreement was negotiated to coincide with the term of a related licensing agreement Biosite had with Scios.

Section 5.2.1 of the Agreement requires Beckman to offer for sale and to sell the BNP assay exclusively to Biosite. Section 5.2.2 prohibits Biosite from engaging third parties other than Beckman to manufacture for Biosite a diagnostic BNP assay for use. Section 5.2.3 of the Agreement prohibits Beckman from researching or developing an assay that detects the presence or absence of the BNP or NT-proBNP proteins or markers for use in diagnosing cardiac disease until two years before the Agreement's expiration. It does not prohibit the research or development of assays that detect the presence or absence of other proteins or markers, including the biomarkers ST2 or Galectin 3.

4

Although Beckman did not dispute that BNP and NT-proBNP assays were seen as and have become potential substitutes for purposes of the motion for summary adjudication, the parties' characterization of the BNP assays and NT-proBNP assays are slightly different. Quidel characterizes the two as closely-related, with the NT-proBNP assay serving as a potential direct substitute for the BNP assay because it detects a peptide that is secreted alongside the BNP. Beckman has alleged the NT-proBNP assay measures a different protein and uses different antibodies and proteins than the BNP assay, suggesting they are distinctly different.

PROCEDURAL HISTORY

On November 27, 2017, Beckman sued Quidel for declaratory relief for violation of section 16600 and violation of the Cartwright Act (§ 16720 et seq.). Beckman asked the court to issue a declaratory judgment that section 5.2.3 of the Agreement was void and unenforceable as a violation of Business and Professions Code section 16600 and to issue a permanent injunction preventing the enforcement of section 5.2.3 of the Agreement.

In August 2018, Beckman filed a motion for partial summary adjudication on the declaratory judgment cause of action. In its papers, Beckman stated it was developing and planning to launch a new laboratory analyzer platform and wanted to develop a competing assay product for the new platform. It argued section 5.2.3 of the Agreement was a non-compete clause that was void under Business and Professions Code section 16600.

On November 7, 2018, Quidel moved ex parte for a continuance of the motion. In the hearing, Quidel argued additional discovery was necessary to determine if there were material issues of fact in dispute. Beckman contended there was no need for additional discovery to determine the impact

5

of section 16600 on the parties' Agreement. The court denied the ex parte request.

The trial court ultimately granted Beckman's motion for summary adjudication. It noted none of the statutory exceptions to the restraint on trade outlined in section 16600 apply and explained it was unpersuaded by the legal authority cited by Quidel because it predated *Edwards* or discussed exclusive dealing contracts in the context of franchise relationships. Relying on *Edwards,* the trial court concluded section 16600 voids every contract that restrains anyone from " 'engaging in a lawful profession, trade, or business of any kind . . . .' [Citation.]" Accordingly, it concluded section 5.2.3 of the Agreement was void because it "restrains [Beckman] from developing, marketing, or assisting others in the development and marketing of an assay that measures or detects the presence or absence of BNP or NT-proBNP."

Quidel moved to stay the order pending final appeal or pending resolution of a writ petition seeking a stay and sought an extension of time to file a writ. The court granted the request.

On January 18, 2019, Quidel filed a petition for writ of mandate and/or prohibition and sought a stay pending a determination of the writ on its merits. Beckman filed a preliminary opposition to the petition, to which Quidel replied. We issued an order to show cause why a peremptory writ should not issue and stayed the order granting Beckman's motion for summary adjudication pending further order. We deemed the preliminary opposition filed by Beckman to be its return to the order to show cause.

Following issuance of our original opinion, Quidel filed a petition for review with the Supreme Court, which the court granted and deferred pending consideration of *Ixchel*. Once the Supreme Court filed its decision in *Ixchel*, it transferred this matter back to this court. We invited the parties to

6

submit supplemental letter briefs discussing the impact of *Ixchel* on the issues in this case, and in their letters, the parties agreed the matter should be remanded to the trial court for further proceedings. We now turn to the merits of the petition.

DISCUSSION

A

*Review on Petition for Writ Appropriate*

As a preliminary matter, this case is appropriately before us as a petition for writ of mandate. Although appellate courts "seldom use extraordinary writs to review interlocutory summary adjudication orders (grants or denials)" (*Int'l Ins. Co. v. Superior Court* (1998) 62 Cal.App.4th 784, 788), writ review of such orders is statutorily authorized (Code Civ. Proc., § 437c, subd. (m)(1)) and may be appropriate when the petitioner raises a significant legal question of statewide interest (*City of Oakland v. Superior Court* (1996) 45 Cal.App.4th 740, 750-751) or when the order disposes of a large and important portion of the case and intervention by writ will substantially simplify future proceedings (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court of San Francisco* (2003) 114 Cal.App.4th 309, 319 (*Fisherman's Wharf*); *Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672, 1679-1680).

In the present case, the petitioner raised a significant legal question of broad public interest: Does section 16600 invalidate all contractual noncompete provisions, even outside the employment context, without regard to the reasonableness of the restraint imposed or whether the terms actually advance, rather than restrain, competition? (See *California Highway Patrol v. Superior Court* (2006) 135 Cal.App.4th 488, 496; see also *City of Oakland v. Superior Court, supra,* 45 Cal.App.4th at pp. 750-751.)

7

Additionally, our review helps to substantially advance the underlying case toward final resolution because the section 16600 claim addresses the primary area of dispute between the parties.  (See *Fisherman's Wharf, supra,* 114 Cal.App.4th at p. 319.)

B

*Standard of Review*

A grant of summary adjudication is appropriate if there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law.  (Code of Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.)  A plaintiff moving for summary adjudication meets its burden if it proves each element of the cause of action.  (*People v. Schlimbach* (2011) 193 Cal.App.4th 1132, 1140-1141.)  "[I]f a plaintiff who would bear the burden of proof by a preponderance of evidence at trial moves for summary judgment, he must present evidence that would *require* a reasonable trier of fact to find any underlying material fact more likely than not—otherwise, he would not be entitled to judgment *as a matter of law*, but would have to present his evidence to a trier of fact."  (*Aguilar*, at p. 851.)  If the plaintiff meets its burden, the defendant must set forth specific facts showing a triable issue of material facts exist.  (Code Civ. Proc., § 437c, subd. (p)(1); *Schlimbach*, at p. 1141.)

We review a motion for summary adjudication de novo.  (*Benson v. Superior Court* (2010) 185 Cal.App.4th 1179, 1184-1185.)  On appeal, we independently assess the correctness of the ruling, applying the same legal standard as the trial court to determine if there are genuine issues of material fact.  (*AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.* (2018) 28 Cal.App.5th 923, 934 (*AMN Healthcare*); *Fisherman's Wharf, supra,* 114 Cal.App.4th at p. 320.)  "In performing our review, we view the evidence in a

8

light favorable to the losing party . . . , liberally construing [the] evidentiary submission while strictly scrutinizing the moving party's own showing and resolving any evidentiary doubts or ambiguities in the losing party's favor." (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 859.)

C

*Section 16600*

At the heart of this dispute is the interpretation of section 16600, which provides, subject to three statutory exceptions, that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Quidel argues that in the context of an exclusive dealing business arrangement between two corporate entities, a court should consider whether an in-term noncompetition provision promotes competition or restrains it, taking into consideration a multi-factor test that contemplates the purposes, effects, or reasonableness of the provision's restraint. Beckman urges the court to deny the writ on its merits and to uphold the superior court's extension of the Supreme Court's holding in *Edwards*: "Noncompetition agreements are invalid under section 16600 in California, even if narrowly drawn, unless they fall within the applicable statutory exceptions of sections 16601, 16602, or 166025."[3] (*Edwards*, *supra*, 44 Cal.4th at p. 955.)

1. Covenants Not to Compete in the Employment Context

Quidel distinguishes the holding in *Edwards* in two ways. First, it argues the holding should not be extended beyond the employment context it decided. Second, it notes *Edwards* addressed postterm covenants not to compete, and Quidel argues in-term covenants should be treated differently.

---

[3]    The parties agree none of the exceptions apply here.

In *Edwards*, the plaintiff signed an agreement with Arthur Andersen that prohibited him from working for or soliciting any of Arthur Andersen's clients for a period of time following his termination of employment. (*Edwards*, *supra*, 44 Cal.4th at p. 942.) When Arthur Andersen was purchased by HSBC, HSBC offered to employ Edwards, but it required him to sign a termination of noncompete agreement that, among other things, indicated he was voluntarily resigning from Arthur Andersen and released Arthur Andersen from any and all claims. (*Id.* at p. 943.) In exchange, Arthur Andersen would release Edwards from the noncompetition agreement. (*Ibid.*) Edwards argued the initial noncompetition agreement was illegal under section 16600, so Arthur Andersen's offer to release him from its terms could not serve as consideration for Edwards's agreement to release Arthur Andersen from all legal claims. (*Edwards*, at pp. 944-945.)

The Supreme Court agreed with Edwards. It explained: "[S]ection 16600 evinces a settled legislative policy in favor of open competition and employee mobility"; it noted people have the right to pursue lawful employment and to engage in businesses and occupations of their choice. (*Edwards*, *supra*, 44 Cal.4th at p. 946.) Accordingly, it concluded the noncompete provision was prohibited by section 16600 and void as a matter of law. (*Edwards*, at p. 946.) In so doing, it held that noncompete agreements in employment contracts are per se invalid in California as an unlawful restraint on trade.

However, " '[i]t is axiomatic that language in a judicial opinion is to be understood in accordance with the facts and issues before the court. An opinion is not authority for propositions not considered.' " (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 680, quoting *Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1195.) The Supreme

10

Court defined the relevant issue as whether "Business and Professions Code section 16600 prohibit[s] *employee* noncompetition agreements," (*Edwards, supra,* 44 Cal.4th at pp. 941-942*,* italics added), and it concluded "section 16600 prohibits *employee* noncompetition agreements unless the agreement falls within a statutory exception" (*Id.,* at p. 942., italics added). Thus, the per se ban on noncompetition clauses outlined in *Edwards* is limited to employment agreements. (*Ixchel, supra,* 9 Cal.5th at p. 1158 ["The question of whether noncompetition agreements outside the employment context are per se invalid was not presented in *Edwards.*"].)

The strict application of section 16600 in the employment context is supported by the policy: "California courts have consistently declared this provision an expression of public policy to ensure that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice." (*Metro Traffic Control, Inc. v. Shadow Traffic Network* (1994) 22 Cal.App.4th 853, 859; *Ixchel, supra,* 9 Cal.5th at p. 1158 [explaining the rationale in *Edwards* focused on policy considerations].) This is because "[t]he interests of the employee in his own mobility and betterment are deemed paramount to the competitive business interests of the employers, where neither the employee nor his new employer has committed any illegal act accompanying the employment change." (*Diodes, Inc. v. Franzen* (1968) 260 Cal.App.2d 244, 255.)

Beckman contends a panel of this court, in *AMN Healthcare*, concluded the rule outlined in *Edwards* applies "notwithstanding the different factual context or the existence of prior inconsistent authority." We disagree. *AMN Healthcare* addressed solicitation of individual employees by a competitor. (*AMN Healthcare, supra,* 28 Cal.App.5th at pp. 928-931.) The conclusion that the noncompete and nonsolicitation clause was invalid focused on the

11

interests of the employees in the context of their employment agreements, and the challenged portion of the employment contract "restrained individual defendants from practicing . . . their chosen profession—recruiting travel nurses . . . ." (*Id.* at p. 936.)

Unlike noncompete clauses that attempt to dilute or eliminate employee mobility, an interest California courts have found to be a cherished commercial right (*Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514), which is paramount to a business's competitive interest (*Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1151), the clause at issue in the matter before us presents a different context, challenging a provision in an exclusive dealing agreement between two sophisticated biotechnology companies. Here, no individual person's ability to seek employment is impacted by the challenged portion of the Agreement. Simply put, this matter falls outside the confines of *Edwards* because it does not address an individual's ability to engage in a profession, trade, or business.

2. Covenants Not to Compete Outside the Employment Context

Noncompetition clauses have been deemed valid outside the employment arena. In *Great Western Distillery Products, Inc. v. John A. Wathen Distillery Co.* (1937) 10 Cal.2d 442 (*Great Western*), the parties entered a requirements contract in which one party would purchase all the whiskey it required for sale in California from the other, and in exchange the other party would not sell whiskey in California, other than to an identified customer. (*Id.* at pp. 444-446.) The Supreme Court reviewed the cases interpreting former Civil Code section 1673, the predecessor statute to Business and Professions Code section 16600, and noted, "[t]he decisions in this state have recognized and applied the distinction made by authority elsewhere that if the public welfare be not involved and the restraint upon

12

one party be not greater than protection to the other requires, the contract will be sustained although it in some degree may be said to restrain trade." (*Great Western*, at pp. 448-449.)

The Supreme Court determined the purpose of the contract in *Great Western* was to promote business, and it concluded any incidental or indirect restrictions did not bring the contract within the statute. (*Great Western*, *supra*, 10 Cal.2d at p. 446.) It explained the contract was "an attempt by the parties to create a market, within a small designated territory, for the warehouse receipts of bourbon whiskey of one firm to investors in that type of security. Such a limited restriction does not appear to affect the public interests and is obviously designed only to protect the respective parties in dealing with each other. Furthermore, it does not appear that it was the intent of the parties to control by monopoly the market price of the securities or in any manner to interfere with the normal fluctuations resulting from the law of supply and demand." (*Id.* at pp. 449-450.)

Following *Great Western*, courts applied a test of reasonability, contemplating whether the arrangement promoted competition. For example, in *Keating v. Preston* (1940) 42 Cal.App.2d 110 (*Keating*), the Court of Appeal upheld a provision that barred a lessor from leasing space to competing businesses, commenting the then-modern trend was to evaluate "contracts between individuals intended to promote rather than to restrict a particular business, '[i]n the light of reason and common sense' so as to uphold reasonable limited restrictions." (*Id.* at p. 123, quoting *Great Western*, *supra*, 10 Cal.2d at p. 446.) Similarly, in *Centeno v. Roseville Community Hospital* (1979) 107 Cal.App.3d 62, the Court of Appeal concluded a hospital's exclusive arrangement with a radiology medical group to run the radiology department at the hospital was valid under section 16600. (*Centeno*, at

13

pp. 66, 71-72.) In that case, when a partner in the contracted medical group left that partnership, the hospital refused him access to the radiology facilities. (*Ibid.*) He argued the hospital's contract with the medical group was a restraint on his trade. (*Ibid.*) Discussing other cases in which hospitals maintained a "closed staff," the court explained the agreements were examined "in view of the ends sought to be accomplished," and noted those decisions indicated "the antitrust laws prohibit only those contracts which unreasonably restrain competition." (*Id.* at pp. 71-72.) In a footnote, the court also explained: "Only through application of a balancing test are the California decisions consistent. Exclusive sales or marketing agreements are not per se against public policy if no significant impairment of free market activity obtains from the agreement. [Citations.]" (*Id.* at p. 69, fn. 2.)

While California courts have followed a rule of reason outside the employment context, they have also concluded, without discussion, that agreements to develop monopolies are unlawful. (See *Ixchel, supra,* 9 Cal.5th at p. 1154 [citing cases invalidating contractual restraints in the business context that did not expressly apply a reasonableness standard].) For example, in *Vulcan Powder Co. v. Hercules Powder Co.* (1892) 96 Cal. 510 (*Vulcan Powder*), the court concluded the agreement at issue violated former Civil Code section 1673's prohibition of restraint on trade. (*Vulcan Powder*, at p. 515.) There, four dynamite powder companies agreed to sell their products at a price fixed by a committee of their representatives, limit the territories where the companies could sell their product, and pay to the other companies any profit they earned in excess of the sales over a fixed portion of the total sales. (*Id.* at pp. 513-514.) The agreement developed a monopoly designed to control the price of a commodity, based on a patent held by some of the parties. (See *Standard Oil Co. v. United States* (1931) 283 U.S. 163,

14

174-175 [describing relationship as a monopoly]; see also *Meyers v. Merillion* (1897) 118 Cal. 352, 355-356 [same].) The court did not need to discuss the reasonableness of the restraint on trade because the "tendency to create a monopoly . . . was the objectionable feature of the agreement[] declared invalid." (*Grogan v. Chaffee* (1909) 156 Cal. 611, 614.)

Thus, as long as a noncompetition provision does not negatively affect the public interests, is designed to protect the parties in their dealings, and does not attempt to establish a monopoly, it may be reasonable and valid. (See *Great Western, supra,* 10 Cal.2d at pp. 449-450; see also *Vulcan Powder, supra,* 96 Cal. at p. 516; see also *Associated Oil Co. v. Myers* (1933) 217 Cal. 297, 304 (*Associated Oil*).)

3. In-Term Covenants Not to Compete

Quidel separately contends *Edwards* is distinguishable from the case at hand because it evaluated a postterm covenant not to compete, while in-term noncompetition clauses have been held valid. To support its position, Quidel cites *Dayton Time Lock Service, Inc. v. Silent Watchman Corp.* (1975) 52 Cal.App.3d 1 (*Dayton Time Lock*). The agreement there contained a noncompete provision that prohibited the franchisee from competing with the franchisor for the duration of the contract and for ten years thereafter. (*Id.* at p. 5.) The court held anticompetition limitations in place during the term of the franchisor-franchisee contract were valid, but the postterm limitations were not. (*Id.* at p. 6.) It explained that "[e]xclusive-dealing contracts are not necessarily invalid," and that "[a] determination of illegality requires knowledge and analysis of the line of commerce, the market area, and the affected share of the relevant market." (*Id.* at pp. 6-7.) Because the plaintiff had not developed material evidence on those issues, the court could not

determine as a matter of law that the challenged provision was invalid. (*Id.* at p. 7.)

Beckman contends *Dayton Time Lock* is inapplicable, and it cites *Kelton v. Stravinski* (2006) 138 Cal.App.4th 941, 947-948 (*Kelton*) to support its contention that in-term covenants not to compete are invalid. In *Kelton,* the parties entered a partnership to develop warehouses, but it required the parties to identify the specific projects that fell within the partnership and permitted the parties to participate in other warehouse development activities outside their arrangement. (*Id.* at p. 944.) They separately executed a covenant not to compete, one party agreeing to abstain from operating a warehouse and the other abstaining from designing or building any warehouses. (*Id.* at p. 945.) Kelton eventually sued Stravinski claiming an interest in a variety of projects under the terms of the covenant not to compete. (*Id.* at p. 945.) The court concluded the covenant not to compete contravened the public policy of open competition in violation of section 16600. (*Kelton*, at pp. 946-947.)

Although *Kelton* distinguished its facts from those in *Dayton Time Lock* because *Dayton Time Lock* regarded a franchise agreement instead of an equal partnership, the Ninth Circuit noted that "*Dayton Time Lock* and *Kelton* make evident that under [section] 16600 an in-term covenant not to compete in a franchise-like agreement will be void if it 'foreclose[s]

competition in a substantial share' of business trade or market."[4] (*Comedy Club, Inc. v. Improv West Associates* (9th Cir. 2009) 553 F.3d 1277, 1292, quoting *Dayton Time Lock, supra*, 52 Cal.App.3d at p. 6.) Thus, in-term covenants not to compete in exclusive dealing agreements are not per se invalid.

4. Comparing Section 16600 to the Cartwright Act

Finally, Beckman argues section 16600 cannot require evaluation of the reasonableness of the terms of a noncompetition provision because such an approach would make the Cartwright Act, which already requires a similar evaluation, superfluous. Beckman explains that under a test of reasonableness, a litigant deciding whether to allege a violation of section 16600 would have the burden of proving the unreasonableness of the restraint on trade, but would recover only declaratory relief, while a litigant alleging a violation of the Cartwright Act would carry the same burden, but success could be rewarded with treble damages in addition to a declaration of invalidity. Thus, there would be "no reason to ever invoke section 16600 to challenge an 'in-term' business restraint."

As the Supreme Court recently explained, the Cartwright Act and section 16600 "share a statutory purpose and doctrinal heritage in common

---

[4]   Beckman contends franchise agreements are different from other exclusive dealing contracts because they are heavily regulated and necessarily contain exclusivity provisions to protect the franchisor's intellectual property due to the franchisee's substantial association with the franchisor's trademark or other mark. (See *Kelton, supra,* 138 Cal.App.4th at pp. 947-948.) We decline to draw any conclusion as to the appropriateness of comparing a franchise agreement to other types of exclusive dealing arrangements, as the comparison is not necessary to reach our conclusion here. The Supreme Court recently "decline[d] to construe section 16600 to call [franchise] arrangements into question simply because they restrain trade in some way." (*Ixchel, supra,* 9 Cal.5th at p. 1161.)

17

law prohibitions on restraints of trade.  They should therefore be interpreted together." (*Ixchel, supra,* 9 Cal.5th at p. 1160.)  Section 16600 should be read to incorporate the same rule of reason applied by the Cartwright Act.  (*Ibid.*)

Further, the statutes can apply to different courses of action.  While section 16600 prohibits restraints of "lawful profession, trade, or business of any kind," the Cartwright Act also prohibits trusts, a "combination of capital, skill or acts by two or more persons" for any of a number of enumerated purposes.[5]  (§ 16720.)  Finally, even though a similar standard applies to agreements outside the employment context, the post-*Edwards* application of

_____

[5]      Section 16720 provides:  "A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes:  [¶]  (a) [t]o create or carry out restrictions in trade or commerce[;]  [¶]  (b) [t]o limit or reduce the production, or increase the price of merchandise or of any commodity[;]  [¶]  (c) [t]o prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity[;]  [¶]  (d) [t]o fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this State[;]  [¶]  (e) [t]o make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they do all or any or any combination of any of the following:  [¶]  (1) [b]ind themselves not to sell, dispose of or transport any article or any commodity or any article of trade, use, merchandise, commerce or consumption below a common standard figure, or fixed value[;]  [¶] (2) [a]gree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure[;]  [¶]  (3) [e]stablish or settle the price of any article, commodity or transportation between them or themselves and others, so as directly or indirectly to preclude a free and unrestricted competition among themselves, or any purchasers or consumers in the sale or transportation of any such article or commodity[;]  [¶] (4) [a]gree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected."

18

section 16600 as a per se ban on covenants not to compete identifies a different standard for employment agreements. Applying a similar standard in some contexts under both laws while providing additional bases for action means the statutes are not redundant.[6]

D

*Application of Section 16600 to the Agreement*

To prevail on its motion for summary adjudication, Beckman must demonstrate there are no triable issues of material fact that challenge the reasonability of section 5.2.3 of the Agreement. That is, Beckman must show there is no dispute that section 5.2.3 (1) tends to restrain trade more than promote it (*Great Western, supra*, 10 Cal.2d at p. 446; *Ixchel, supra,* 9 Cal.5th at pp. 1160-1161; *Martikian v. Hong* (1985) 164 Cal.App.3d 1130, 1133; *Keating, supra*, 42 Cal.App.2d at p. 123); (2) is not necessary "to protect the respective parties in dealing with each other" (*Great Western*, at pp. 449-450; *Associated Oil, supra*, 217 Cal. at p. 306; *Martikian*, at p. 1133); or (3) forecloses a substantial share of the line of commerce. (*Kelton, supra*, 138 Cal.App.4th at pp. 947-948.)

There is no dispute that section 5.2.3 of the Agreement limits Beckman's ability to develop a competing assay to diagnose cardiac disease. Section 5.2.3 prohibits Beckman from researching or developing an assay

---

6     Civil Code section 1673, the predecessor statute to Business and Professions Code section 16600, was enacted in 1872. (*Cianci v. Superior Court* (1985) 40 Cal.3d 903, 922.) The Cartwright Act was enacted in 1907. (*Ibid.*) Section 16600 and the Cartwright Act were placed in the Business and Professions Code as part of a statutory consolidation in 1941. (*Cianci*, at p. 922.) Business and Professions Code section 16700, which opens the chapter containing the Cartwright Act, states: "The provisions of this chapter are cumulative of each other and of any other provision of law relating to the same subject in effect May 22, 1907."

that detects the presence or absence of the BNP or NT-proBNP proteins or markers. Quidel maintains that the BNP and NT-proBNP assays are interchangeable and that Beckman can research and develop the presence or absence of other biomarkers, like ST2 or Galectin 3, suggesting the restraint is reasonably narrow. However, whether these limitations tend to restrain trade more than promote it remains unclear and requires a factual analysis.

Additionally, whether section 5.2.3 of the Agreement is necessary to protect the parties in their dealings similarly requires a factual analysis, and the record on this issue is incomplete. Quidel argues that because the NT-proBNP assay is a direct substitute for the BNP assay, the prohibition on researching and developing an NT-proBNP assay until two years before the Agreement's conclusion is necessary to protect Quidel's interests in dealing with Beckman. However, whether prohibiting development of NT-proBNP assay is necessary to protect parties in their dealings is disputed. Beckman opted not to present evidence regarding the purpose or effect of the Agreement, instead contending such facts and evidence were immaterial to the dispute regarding application of section 16600. Finally, whether the Agreement forecloses a substantial share of the line of commerce has likewise not been factually developed.

In the November 7, 2018 hearing, Beckman's attorneys repeatedly conceded that the purpose of their motion for summary adjudication was to avoid engaging in detailed discovery on anti-trust issues, stating that if "full-blown anti-trust analysis" was required, the motion should be denied. Because the rule announced in *Edwards* does not extend beyond the employment context and a rule of reason applies to determine the validity of the contractual provision (*Ixchel, supra,* 9 Cal.5th at p. 1162), we conclude such factual development is relevant and necessary here.

20

DISPOSITION

The petition for writ of mandate and/or prohibition is granted. Let a writ issue directing the trial court to vacate its December 7, 2018 order granting the motion for summary adjudication, and to enter a new order denying the motion. The stay issued by this court on March 14, 2019, is vacated.

Petitioner to recover costs.


HUFFMAN, Acting P. J.

WE CONCUR:


IRION, J.


GUERRERO, J.

21