Filed 3/10/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JANE IL DOE,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>BRIGHTSTAR RESIDENTIAL INCORPORATED et al.,<br><br>     Defendants and Respondents. | B304084<br><br>Los Angeles County<br>Super. Ct. No. BC667499 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Deirdre H. Hill, Judge.  Reversed and remanded.

Manly, Stewart & Finaldi, Morgan A. Stewart, Saul E. Wolf, Cristina J. Nolan; Esner, Chang & Boyer, Holly N. Boyer, Shea S. Murphy and Kevin K. Nguyen for Plaintiff and Appellant.

Berman, Berman, Berman, Scheider & Lowary, Mark E. Lowary, Brian T. Gravdal and David H. Ryan for Defendants and Respondents.

_____

In her 20s, Jane IL Doe had the mental age of a child. A handyman sexually assaulted her at a residence for the disabled. Doe sued the residence and its owners for failing to protect her. The trial court granted summary judgment because the attack was unforeseeable.

Doe's appeal raises two central issues.

The first concerns evidence law, which can be intricate. Police reports are a prime example. Often these reports contain inadmissible hearsay, yet exceptions riddle the hearsay rule and here they overwhelmed it. The court excluded evidence from a police file that the residence knew its handyman had a history of harassing women. This evidence was relevant to whether the attack was foreseeable. It was admissible, as we explain.

Issue two is duty. What duty did the residence owe Doe? That duty was to take cost-effective steps to protect her from foreseeable harm from people like the handyman. Once the residence knew it had a harasser on its payroll, its duty was to contain that danger.

We reverse because whether the residence or its owners knew or should have known of this danger was a disputed fact. Summary judgment was inappropriate.

I

Doe has severe autism and other disabilities. She lived at Brightstar Residential Incorporated, which provides residential care to people with developmental disabilities. Doe's disabilities meant she could not do things for herself. Like Brightstar's other clients, Doe could not appreciate hazards. All Brightstar's clients required close supervision.

Mary Machado was Brightstar's chief executive officer and administrator. In a declaration, Mary Machado swore she had

been the *sole* owner and administrator of Brightstar since its formation. Other information in the record, however, shows Mary and Norlan Machado as a married couple jointly owned and ran Brightstar.

The Machados shared responsibility for developing residence rules, for hiring and supervising employees, and for ensuring regulatory compliance. They were the top people on Brightstar's organizational chart, which listed Mary Machado as "CEO/Administrator" and Norlan Machado as "Program Manager." They trained Brightstar's employees to report situations that endangered Brightstar's clients. The employee handbook said Brightstar had a "ZERO tolerance policy" for "abuse and/or harassment of any type" involving "both clients/staff."

In 2011, the Machados hired Ruben Alcala as Brightstar's handyman, classing him an independent contractor. Alcala was dating one of Brightstar's caregivers, Martha Amparo, who had recommended Alcala.

Norlan Machado testified he instructed all of Brightstar's independent contractors, including Alcala, to have no contact with the residents beyond brief greetings, not to wander from their work area, and never to be alone with a client. Mary Machado claimed she gave Alcala similar warnings.

Alcala did not have regular hours. He worked as needed and without supervision. Only the Machados and supervisor Jessica Murillo could authorize his jobs at Brightstar. Alcala was supposed to be on the property only at scheduled times and only during the daytime.

Alcala assaulted Doe around 11:00 p.m. on May 10, 2016. Doe was in her room when Alcala came to her window and told her to climb out. She obeyed.

The lone nighttime caregiver, Carmelita Zabala, saw someone outside between Brightstar's two houses. Zabala continued her rounds checking on clients and found Doe was not in her bedroom. The window curtains were open and the blinds were up.

Zabala found Doe in the backyard, undressed from the waist down. Alcala was adjusting his pants and zipper. Zabala called to Alcala, who fled the property and then the country.

Alcala had sexually assaulted Doe. It was difficult for her to communicate, but Doe managed to convey Alcala had placed his "peephole" in her mouth and oral copulation had occurred. Investigators found male DNA, including saliva, on her breasts and genitals. The saliva was Alcala's.

Before Alcala attacked Doe, Brightstar had no surveillance cameras, no alarm system, and a single caregiver at night.

Through her father, Doe sued Brightstar and the Machados. After pleading challenges, Doe's remaining claims were for negligence, negligent supervision, negligent hiring and/or retention, and negligent failure to warn, train, or educate. Doe waived punitive damages.

Brightstar and the Machados moved for summary judgment and summary adjudication. Their motion focused "on the big-picture negligence claim" because they said there were no significant differences between Doe's causes of action. On appeal, all parties have adopted that view.

Brightstar and the Machados argued Alcala's assault was not foreseeable, they had no knowledge of his dangerous

4

propensities, they had no duty to do more than they did, and no facts established breach or conduct by them that caused Doe's injury. They also argued no facts established the Machados had actively participated in the assault.

Doe countered the attack was foreseeable and ample evidence showed the defendants had culpable knowledge: Alcala had a propensity to abuse, he was a risk to Brightstar residents, and he was on the property when he had no right to be there. Doe argued the defendants breached their duty to Doe in many ways, including by retaining Alcala. Doe's attorney told the trial court Brightstar should have fired Alcala.

Doe relied on a police file from the May 2016 incident, along with other evidence. She discussed this file in her discovery responses and cited it repeatedly in her statement of additional material facts. The defendants objected to the police file on grounds of hearsay and relevance and because Doe's briefing did not cite the file properly.

The trial court excluded this file as inadmissible hearsay and granted the motion for summary judgment. The court determined the remaining evidence did not show a reasonable person could have anticipated Alcala's attack. The court concluded Doe had not established the elements of her negligence claims, including duty, breach, and causation against Brightstar. The Machados too were entitled to summary judgment, the court ruled, because they did not authorize or direct Alcala's wrongdoing and were not actively involved in it.

II

We independently review Doe's appeal of the summary judgment ruling. (See *Loomis v. Amazon.com LLC* (2021) 63 Cal.App.5th 466, 475.) We liberally construe evidence offered

5

against the motion and resolve doubts in the opposition's favor. (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.) We review evidentiary rulings for abuses of discretion. (*Wicks v. Antelope Valley Healthcare Dist.* (2020) 49 Cal.App.5th 866, 875.)

A

The trial court incorrectly excluded evidence that suggested Brightstar and the Machados knew Alcala was a problem. We confine our analysis to the disputed police file, which suffices to decide this appeal.

1

Brightstar offers three incorrect arguments why we should not reach the issue of admissibility.

First, Brightstar argues Doe forfeited her arguments by not raising them at the trial court. This argument would extend the forfeiture rule to require the proponent of evidence at the summary judgment stage to file written opposition to evidentiary objections. There is no such rule. (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 851, fn. 11; see also *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 526.) Doe's lawyer argued for admitting the police file at the summary judgment hearing. Doe did not forfeit the issue.

Second, the defendants say Doe did not adequately cite the police reports in her separate statement. The defense concedes the trial court excluded the police file solely as inadmissible hearsay. Citations were not an issue for the court.

Third, the defendants argue Doe failed to identify the key facts from the police reports for the trial court. Puzzlingly, the defendants also confess they are "not certain" whether Doe adequately placed the key facts before the trial court. In any

6

event, Doe did preserve the issue. Her summary judgment opposition argued the defendants ignored red flags about Alcala. Her opposition brief cited her separate statement, which referred to the police file. The defendants had asserted in their separate statement Doe had no facts supporting her claim they knew of Alcala's dangerous propensities. Doe disputed this and pointed to the same evidence. Citing the police file, Doe specified particulars. Doe's presentation was enough. (See *Mackey v. Trustees of California State University* (2019) 31 Cal.App.5th 640, 657 [strictly scrutinize the summary judgment proponent's submissions and liberally view the opponent's].)

2

Doe correctly faults the trial court for excluding evidence. Two types of police report evidence were admissible.

a

The first type concerned Norlan Machado's admissions.

Shortly after the assault, Norlan Machado told responding police officers he knew Alcala had "a history of loitering around the facility and harassing female employees." One of the officers recorded Machado's admission in a police report, which was in the file Doe included as an exhibit to her summary judgment opposition.

The trial court excluded the police file with the comment that "police reports are usually never admissible."

It is true police reports are *often* inadmissible. (E.g., *Johnson v. Lutz* (1930) 253 N.Y. 124, 127–129 [170 N.E. 517, 518–519] [early and influential decision].)

But not *always*.

Under proper conditions, statements in a police report can be admissible evidence. We explain.

In criminal cases, confrontation clause issues can block the admission of police report evidence. (See *People v. Sanchez* (2016) 63 Cal.4th 665, 679–698 (*Sanchez*); cf. Mueller & Kirkpatrick, Evidence (1st ed. 1995) § 8.49, p. 983 ["Nobody thinks prosecutors should use police reports, prepared after the crime was committed, as evidence against criminal defendants."].)

In civil and criminal cases, police reports are inadmissible when they contain improper multiple hearsay. (See Cal. Law Revision Com. com., 29B pt. 5 West's Ann. Evid. Code (2015 ed.) foll. § 1271, p. 6 ["Police accident and arrest reports are usually held inadmissible because they are based on the narrations of persons who have no business duty to report to the police."]; *Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1204–1206.)

An example of a fatal double hearsay problem would be if Witness tells Person X about Fact Y, and Person X writes a report stating, "Witness said Fact Y." The report's account of what Witness told Person X is first-level hearsay. Person X's written report is second-level hearsay: the written report is an out-of-court statement offered for its truth. (See Evid. Code, § 1200; *Sanchez, supra*, 63 Cal.4th at pp. 674–675; *Lake v. Reed* (1997) 16 Cal.4th 448, 459 (*Lake*).) If a court admitted Person X's report for its truth, both Witness and Person X could escape cross-examination without any sign the hearsay was trustworthy. That result is what the hearsay rule aims to avoid.

The trial court applied a general rule, but the general rule does not hold here.

Double hearsay is admissible if a justification for admitting the evidence rebuts the hearsay objection at each level. (Evid.

8

Code, § 1201; see *Lake, supra*, 16 Cal.4th at pp. 461–462 [admitting party admission in police report]; cf. *Walker v. Superior Court* (2021) 12 Cal.5th 177, 201 [suggesting probation reports can be admissible as official records under proper circumstances].)

For Machado's admission, double rejoinders cured the double hearsay problem.

At level one, Machado's statement to the officer was the admission of a party opponent. (See *Lake, supra*, 16 Cal.4th at pp. 461–462.) Section 1220 of the Evidence Code provides a hearsay exception for admissions by party opponents, and Norlan Machado is Doe's party opponent. Machado's statement to police also was admissible for its truth against his company Brightstar. (See Evid. Code, § 1222.)

At level two, the officer's police report was admissible as an official record. (Evid. Code, § 1280; *Lake, supra*, 16 Cal.4th at pp. 461–462; *People v. Hall* (2019) 39 Cal.App.5th 831, 843–845 (*Hall*); *Donley v. Davi* (2009) 180 Cal.App.4th 447, 461.)

The official records exception to the hearsay rule is based on the presumption that public officers properly perform their official duties. When public officers have a duty to make accurate statements about facts within their official cognizance, the great probability is that this incentive will prompt them to work correctly, which creates the trustworthiness that justifies acceptance of the hearsay statement. (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 317; see also *Fisk v. Department of Motor Vehicles* (1981) 127 Cal.App.3d 72, 77; cf. Mueller & Kirkpatrick, Evidence Under the Rules (5th ed. 2004) p. 284 [public records exception presumes public servants in a democracy go about their tasks with care, without bias or corruption, and that the scrutiny

and exposure surrounding governmental functions adds assurance that public records are trustworthy].)

The incentive to be accurate disappears in other settings. Consider the private train engineer in *Palmer v. Hoffman* (1943) 318 U.S. 109, 111–115, who drove his train into a car and killed its passenger. That engineer knew he was very likely "to be charged with wrongdoing as a participant in the accident, so that he [was] almost certain, when making the memorandum or report, to [have been] sharply affected by a desire to exculpate himself and to relieve himself or his employer of liability." (*Hoffman v. Palmer* (2d Cir. 1942) 129 F.2d 976, 991, italics omitted.) This "vigorous motive to misrepresent" meant the train engineer's report more resembled those by maritime companies, which typically were biased and partisan disclaimers of responsibility for disasters, where " 'the waves are almost always mountain high' " and the winds are " 'never less than a hurricane.' " (*Id.* at p. 981.)

Brightstar contested neither the authenticity of the police report nor the foundational requirements of the official records exception; rather, it argued the exception did not reach witness statements in the report. Nor has Brightstar suggested the police investigating *Alcala* had some incentive or bias against *Machado*. And this civil case does not implicate the confrontation clause issues that arise in criminal cases. (*Sanchez*, *supra*, 63 Cal.4th at pp. 679–698 & fns. 6 & 21; cf. *Hall*, *supra*, 39 Cal.App.5th at p. 844 [distinguishing *Sanchez*].)

Norlan Machado's admission to police also was *relevant* to the foreseeability of Alcala's attack. What exactly was Alcala's "history" of harassing women? Machado mentioned employees but otherwise did not say. In the light favorable to Doe, a

permissible inference would be that Alcala's conduct had been serious and repeated and that Machado was not eager to detail it.

If you know someone has a history of harassing women, you might suspect that person has that propensity. (Cf. Evid. Code, § 1108 [as an exception to the general ban on propensity evidence, proof of a propensity to commit sexual offenses is admissible under some circumstances].)

In sum, Machado's admission regarding Alcala's history of loitering and harassment properly should have been in the record. (See *Rupf v. Yan* (2000) 85 Cal.App.4th 411, 430–432 & fn. 6.)

The same analysis governs other admissions Norlan Machado made to police. Machado told them "Alcala is not allowed on premise after hours and without [Norlan] Machado directly supervising him"; "Machado spoke with Alcala and informed [him] he was not allowed to be in the facility unless he was specifically working on repairs while being directly supervised."

This evidence is relevant. A fact finder could infer Norlan Machado was concerned enough about Alcala's history to change the company's practice and to determine Alcala needed Machado's personal supervision. This admission should have been in the record.

Finally, Norlan Machado told police that "since his conversation with Alcala, . . . Alcala has refrain[ed] from loitering in the facility." Viewing this evidence favorably to Doe, a fact finder could infer Machado was aware Alcala posed a danger and had responded ineffectively.

b

The second type of admissible evidence was a group of statements Brightstar employees made to police about Alcala. At the first level, Doe offered these employee statements, not for their truth, but for the nonhearsay purpose that Brightstar and its employees were on notice of Alcala's disturbing and unsupervised presence. (See *Magnolia Square Homeowners Assn. v. Safeco Ins. Co.* (1990) 221 Cal.App.3d 1049, 1057.) The police reports again counted as official records, which addressed the second level of the double hearsay issue. Brightstar and the Machados do not argue otherwise and again do not contest the foundational elements of this hearsay exception.

One example was Brightstar employee Antonia Garay's statement to police. The quote refers to Martha Amparo, the Brightstar employee who dated Alcala. We add our italics to the police report: "Once [Garay] saw Ruben [Alcala] at approx @ 1945 hrs [ ] 1½ months ago in the back yard @ the tool shed. Martha was not at work yet. . . . Saw him @ loc on weekends in the evening hours. . . . [A]lmost everyday she would see Ruben come into the facility when she was leaving & Martha began to work. . . . *Once she heard [Doe] tell Ruben 'Hi daddy.' Martha said he is not your daddy*."

This was triple hearsay. (1) Garay heard Doe and Amparo speak about "daddy"; (2) Garay told the officer what she heard; and (3) the officer wrote in the police report what Garay had related.

Starting with level one, the words Amparo and Doe spoke about "daddy" were not helpful for their truth—whether Alcala was or was not Doe's daddy—but to show a usage suggesting

12

intimacy between Alcala and Doe, as well as Amparo's concern about this intimacy.

At level two, Garay's statement showed employee Garay had notice of possible intimacy between Alcala and a Brightstar resident.

At level three, the police report again was an official record.

The evidence is relevant to the issue of whether Brightstar was on notice of Alcala's propensity to abuse Brightstar's clients.

This evidence was admissible. Employee Garay's statement to police was not an admission, but rather was not hearsay at all. Doe was offering these statements to prove Brightstar's corporate knowledge, not the truth. Whether true or not, employee Garay's knowledge was attributable to her employer Brightstar: that Garay had notice Alcala was on the property late at night and knew Doe called Alcala "daddy." (See Civ. Code, § 2332; *Taylor v. Centennial Bowl, Inc.* (1966) 65 Cal.2d 114, 125 (*Taylor*) [hearsay rule does not apply when evidence is offered for notice rather than truth]; *Northern Natural Gas Co. v. Superior Court* (1976) 64 Cal.App.3d 983, 992–993 [doctrine of imputed knowledge made corporate president chargeable with knowledge of the statements and conduct of employees].)

The same analysis governs Brightstar caregiver Lorena Chavez's statement to police that Alcala came to Brightstar for unsupervised meals with his girlfriend and at nighttime, and that Doe and Alcala would say hello to each other. So too with caregiver Stacey Solomon's report to police that she had seen Alcala on the property at night and that Doe would say hello to Alcala.

13

Whether true or not, these employee statements were admissible as nonhearsay for their notice to Brightstar as a business entity. In a light favorable to Doe, the staff effectively said Alcala was on Brightstar's property when he was not supposed to be there, and he was there often enough to have a familiar relationship with Doe. This knowledge was chargeable to Brightstar.

The same holds for statements other Brightstar caregivers gave police about seeing and reporting about Alcala unsupervised on the property. The police reports recounted these statements, which were not hearsay or double hearsay and which were admissible to show Brightstar's knowledge.

3

Excluding this evidence was an abuse of discretion.

These statements permit an inference Brightstar knew its company handyman had a history of harassing women and was loitering to groom a disabled woman for assault. In a light favorable to Doe, the admissible evidence would permit, but not require, a fact finder to infer Alcala was a problem waiting to happen. Brightstar hotly disputes this inference by pointing, for instance, to Norlan Machado's declaration that he had no basis for suspecting Alcala had a propensity to harass women. Machado called the allegations against him and Brightstar "outrageous and insulting." A fact finder must resolve this conflicting evidence.

B

Duty is the second main issue. The parties dispute what duty Brightstar owed Doe. For now we refer to the Machados and Brightstar collectively as Brightstar, although we will treat

14

these three defendants individually in the final portion of this opinion.

Formulating the contours of duty in tort law is a self-conscious judicial effort to craft wise policy. (*Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 442 (*Tarasoff*).)

This is a case of third-party criminality: *Alcala* is not in this case but rather is a third party who intentionally attacked Doe in a criminal way and directly caused injury for which Doe seeks to hold *Brightstar* liable. These kinds of cases have been common for generations. (E.g., *Winn v. Holmes* (1956) 143 Cal.App.2d 501, 505 [restaurant keepers may not sit idly by when they know a customer is likely to be assaulted].)

For noncriminal defendants like Brightstar and the Machados, the injury was something these defendants never wanted. Rather, for Brightstar, this event was disastrous for many reasons. But this does not mean Brightstar owed Doe *no* duty.

We begin by summarizing Brightstar's duty: it was to take cost-effective measures to protect Doe from foreseeable harm from people like the handyman. Viewing the evidence favorably to Doe, Alcala indeed was a foreseeable and worrisome hazard, and the toll of his possible attack on a disabled client could be frightful. The array of Brightstar's possible safety precautions all involved costs that pale in comparison. Because the burden of preventing this attack was relatively low while the benefit would have been great, Brightstar had the duty, as a matter of law, to contain the danger Alcala posed. (E.g., *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1210–1213 (*Castaneda*).)

Now we detail the analysis supporting this summary.

15

The tort doctrine of duty begins by recognizing Doe and Brightstar were in a special relationship, which arises when a victim has a legal right to expect protection from a defendant that can control a dangerous third party's conduct. (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 216 (*Brown*).) Doe rightly expected Brightstar to protect her. Protection was what Brightstar claimed to offer. It was part of what it was being paid to supply. Brightstar likewise could control Alcala in pertinent ways. It determined whether and when Alcala would work at the property and under what conditions and supervision. It could replace him at will. Thus the relationship between Doe and Brightstar was special.

Even when a special relationship exists, courts will not find a duty where the factors of *Rowland v. Christian* (1968) 69 Cal.2d 108, 112–113 counsel against it. (See *Brown*, *supra*, 11 Cal.5th at pp. 209, 217.) That is not the case here; the *Rowland* factors counsel *in favor* of finding that Brightstar owed this duty to Doe.

Courts also will not require proposed safeguards that are ineffectively onerous. (E.g., *Castaneda*, *supra*, 41 Cal.4th at pp. 1210–1213; see also *Brown*, *supra*, 11 Cal.5th at pp. 217–222 [analyzing potential limits to liability].)

The *Castaneda* opinion analyzed whether proposed safety precautions were cost-justified. This approach is familiar and authoritative. (E.g., *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1150, 1153 (*Kesner*) [courts assign tort duty to ensure those best situated to prevent injuries are incentivized to do so]; *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 238–250 [to protect patron from crime, bar had duty to take minimally burdensome steps but not costly security measures]; *Morris v. De La Torre* (2005) 36 Cal.4th 260, 277–278 [proprietor's duty to

16

patrons includes an obligation to call 911 about an ongoing assault or to take similarly minimal safety measures]; *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 473–475 [court determined duty by conducting a "social utility analysis" that weighs the utility of proposed safety measures against their burdens]; *Taylor, supra,* 65 Cal.2d at pp. 123–124 [duty to protect arose because defendant "easily" could have undertaken the proposed protective measure]; *Sinn v. Farmers' Deposit Savings Bank* (1930) 300 Pa. 85, 90 [150 A. 163, 164] [same].)

This approach carries forward the reigning American practice of formulating tort law to create rational incentives that reduce the extent of injuries. California has used this approach for nearly a century. (E.g., *Berkovitz v. American River Gravel Co.* (1923) 191 Cal. 195, 199 ["it cannot be the intention of the law that a watchman must be maintained over the rear light to observe whether it is constantly burning"]; see *Baker-Smith v. Skolnick* (2019) 37 Cal.App.5th 340, 345–346 [discussing *Berkovitz*].)

Justice Roger Traynor articulated this approach in his celebrated *Escola* opinion. (*Escola v. Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 462 (*Escola*) (conc. opn. of Traynor, J.) [public policy demands responsibility be fixed wherever it will most effectively reduce injury hazards]; see also *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63–64 (Traynor, J.) [unanimous court adopts *Escola*]; *Tarasoff, supra,* 17 Cal.3d at p. 442 ["The containment of such risks lies in the public interest."].)

After Justice Traynor broke trail, Professor (and now Senior United States Circuit Judge) Guido Calabresi laid out the incentive approach in his landmark 1970 book, The Costs of

17

Accidents (Calabresi).  (See *Kesner, supra*, 1 Cal.5th at p. 1153 [applying and citing *Escola* and Calabresi].)

The approach has spread from California and Calabresi to become national law.  (See *Air and Liquid Systems Corp. v. DeVries* (2019) __ U.S. __, __ [139 S.Ct. 986, 994–995] [majority opinion determines tort duty by analyzing who is in the better position to prevent the injury, citing Calabresi, *supra*]; *id*. at p. 997 (dis. opn. of Gorsuch, J.) [dissent does the same]; see generally Sharkey, *Modern Tort Law:  Preventing Harms, Not Recognizing Wrongs* (2021) 134 Harv. L.Rev. 1423, 1423, fn. 3, 1435–1444.)

Some scholars claim a perspective of redressing wrongs clashes with an incentive approach to tort law.  (E.g., Goldberg & Zipursky, *Thoroughly Modern Tort Theory* (2021) 134 Harv. L.Rev. Forum 184, 184–199.)  No party here argues that.

In sum, the trial court erred in ruling Brightstar owed Doe no duty.  The court similarly erred in concluding Doe could not establish breach and causation.  There was a material factual dispute about whether keeping Alcala at Brightstar breached this duty and caused Doe's injuries.

C

Apart from Brightstar as a business entity, there also are disputed material facts about the extent to which Mary and Norlan Machado individually knew or reasonably should have known about the hazard Alcala posed.  We thus reverse the summary judgment as to the Machados as individuals.  (See, e.g., *PMC, Inc. v. Kadisha* (2000) 78 Cal.App.4th 1368, 1372, 1379– 1380.)

## DISPOSITION

We reverse the judgment for Brightstar Residential Incorporated and for Mary and Norlan Machado. We remand the matter for further proceedings consistent with this opinion. We award costs to appellant Jane IL Doe.


WILEY, J.


We concur:


STRATTON, Acting P. J.


HARUTUNIAN, J.[*]

---

[*]    Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19